UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
FOR THE WESTERN DIVISION

| | | |
|---|---|---|
| MARIE MINCY, | : | CASE NO. 1:09-CV-065 |
| | : | |
| Plaintiff | : | Judge Dlott |
| | : | |
| v. | : | |
| | : | |
| CINCINNATI CHILDREN'S HOSPITAL | : | **MOTION FOR SUMMARY** |
| MEDICAL CENTER, | : | **JUDGMENT OF DEFENDANT** |
| | : | **CINCINNATI CHILDREN'S** |
| Defendant. | : | **HOSPITAL MEDICAL CENTER** |

Defendant Cincinnati Children's Hospital Medical Center ("Children's Hospital"),

pursuant to Federal Rule of Civil Procedure 56, moves for summary judgment on Plaintiff Marie

Mincy's claims against it. Children's Hospital respectfully submits there is no genuine issue of

material fact and that judgment in its favor is appropriate. A memorandum in support of this

motion and declaration of Rodolfo Canos, III are attached.

Respectfully submitted,

s/ Timothy P. Reilly
Timothy P. Reilly (0018507)
Paula J. Dehan (0076914)
Taft, Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, Ohio 45202
(513) 381-2838
(513) 381-0205 (fax)
reilly@taftlaw.com
dehan@taftlaw.com

Trial Attorneys for Defendant
Cincinnati Children's Hospital Medical
Center

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
FOR THE WESTERN DIVISION

| | | |
|---|---|---|
| MARIE MINCY, | : | CASE NO. 1:08-CV-065 |
| | : | |
| Plaintiff | : | Judge Dlott |
| | : | |
| v. | : | |
| | : | |
| CINCINNATI CHILDREN'S HOSPITAL | : | **MEMORANDUM IN SUPPORT OF** |
| MEDICAL CENTER, | : | **MOTION FOR SUMMARY** |
| | : | **JUDGMENT OF DEFENDANT** |
| Defendant. | : | **CINCINNATI CHILDREN'S** |
| | : | **HOSPITAL MEDICAL CENTER** |

## I. INTRODUCTION

Defendant Cincinnati Children's Hospital Medical Center ("Children's Hospital") moves the Court for summary judgment on all counts against it in the Amended Complaint of Marie Mincy. The claims brought by Mincy against Children's Hospital are for race discrimination, race harassment and retaliation under Ohio Rev. Code § 4112, Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. Mincy also brings claims for disability discrimination under Ohio Rev. Code 4112 and the Americans with Disabilities Act, retaliation under the Family and Medical Leave Act, defamation, and three claims for breach of Ohio public policy. No material fact is in dispute.

## II. STATEMENT OF UNDISPUTED FACTS

### A.   Children's Hospital Medical Center – College Hill

Cincinnati Children's Hospital Medical Center provides mental health treatment on a residential and inpatient basis at its College Hill Campus ("College Hill") to children and adolescents with severe cognitive, psychiatric and/or behavioral disorders. (Canos Decl. ¶ 2) The patients admitted to the College Hill residential treatment center live on the unit from one to

12 months.  (*Id.*, ¶ 3)  The patients often come from abusive environments and receive treatment for psychiatric disorders ranging from self-harming behaviors and schizophrenia to bipolar disorder.  (*Id.*)

### B.     Plaintiff Marie Mincy

Plaintiff Marie Mincy was employed at College Hill as a Mental Health Specialist ("MHS") assigned to the third shift on the P2 South residential unit.  (Pl. Dep. 31)  Mincy was required, among other things, to provide direct patient care to psychiatric patients, to document care in patient medical charts through the use of "progress notes," and to exchange patient clinical information with other staff members.  (Pl. Dep. 36-39, Ex. 2)

### C.     Mincy Has A History Of Employment Issues.

Mincy's employment at College Hill was marked by conflict and confrontation.  For example, in the early Fall of 2007, Mincy and a co-worker, Yvonne Dawson, were called in by management after each complained about the other's behavior on the unit.  (Pl. Dep. 65, 77, 81)

Issues continued in October, 2007, when Mincy's supervisor instructed her to audit medical charts during her scheduled shifts.  (Pl. Dep. 94)  Mincy felt she should not have to complete the assigned duty unless she volunteered, so she ignored her supervisor's instruction. (*Id.,* Ex. 7)  Weeks later, Mincy's supervisor again instructed her to perform the chart audits. Still defiant, Mincy wrote, "as I stated earlier I have no desire to do that task."  (Pl. Dep. 110, Ex. 7, p. 7)  The supervisor immediately made clear to Mincy that his direction was not a request. (Pl. Dep. 111, Ex. 7, p. 8)

Mincy understood that she was required to perform the chart audit, but she continued to ignore her supervisor's direction, claiming she could not be made to perform what she contended were "voluntary" duties.  (Pl. Dep. 95-96, 111)  By mid-January, nearly three months after first

being instructed to complete the chart audits, Mincy still had not done so, insisting that "it was not something she wanted to do" and she was "not interested in completing the task." (Pl. Dep. Ex. 7, p. 11)  On January 16, 2008 Mincy was placed on a First Written Warning for failing to follow a clear directive to perform the assigned task. (Pl. Dep. 124-25, Ex. 8)  The warning directed Mincy to complete all training and begin the chart audits by February 1 or face additional discipline. (Pl. Dep. Ex. 8)

True to her prior form, Mincy ignored the directive and did not complete the training by February 1. (Pl. Dep. 127)  The matter was taken to the Director of Residential Services and Psychiatry, Theresa Broerman, who compelled Mincy to perform the assigned duties, nearly four months after she was first instructed to do so. (Pl. Dep. 130-31)

### D. A Co-worker Reports That She Felt Threatened By Mincy.

In the Spring of 2008, College Hill provided training for staff focused on de-escalation techniques and reinforcement of positive behaviors for psychiatric patients. (Pl. Dep. 151-53)  The training, referred to as "Culture Change," lasted several days and included meetings facilitated by Human Resources, which were designed to promote a safe and positive work environment. (Pl. Dep. 207; Canos Decl. ¶ 4)  Director Broerman learned afterward that a social worker felt intimidated by Mincy during a discussion in one of the meetings. (Broerman Dep. ¶ 100-01)

### E. Mincy Negligently Charts On A Patient Who Was Discharged The Day Before.

Mincy's conduct and performance deteriorated significantly in late August 2008, when she documented in a patient medical record that the patient had slept through the night without problem, when, in fact, the patient had been discharged the prior day. (Pl. Dep. 224-25, Ex. 15)  Concerned about the possible falsification of a medical record, Mincy's supervisor at that time,

Rodolfo Canos, III[1] informed her of the problem.  (Pl. Dep. 225, Ex. 14)  Refusing to accept any accountability, Mincy responded by blaming others for the fact that she had charted on a patient who was not there.  (Pl. Dep. 226, Ex. 14)  Canos inquired:

> How was a body counted on 8/22/08 and 8/25/08 when she was discharged on 8/21/08?  I hear you complaining about other staff's deficiencies but where is the accountability on your end?

Canos instructed Mincy that:

> **All clients are to be checked on physically during the night shift.  That means opening doors and going in rooms.  <u>Looking at names on the board and assuming they are there is unacceptable.</u>  (Pl. Dep. Ex. 14)**

Canos, with assistance from Human Resources, continued investigating the matter and concluded that Mincy and another employee had each failed to confirm the physical presence of the patient on the unit.  (Pl. Dep. Ex. 15; Canos Dep. 60-61, 69)  On the morning of September 18, 2008, Canos and Broerman delivered verbal counseling to Mincy.[2]  (Pl. Dep., Ex, 15; Canos Decl. ¶ 11)  The memo documenting the verbal counseling summarized the investigation findings and set out the expectations for Mincy as follows:

> <u>BACKGROUND</u>
> During our previous discussions, we reviewed Rodolfo Canos, III and my concerns related to the fact that **on August 22, 2008 you documented on the College Hill Residential Mental Health Specialist Progress Note that "Client asleep throughout shift w/out difficulty," when that client had been discharged the day prior on August 21, 2008.  You did not read the "blurbs"[3] which documented the client's 8/21/08 discharge, you did not attend report to review with the prior shift information about this client, nor did you check the client's room to confirm her presence.**  This action negatively impacts your credibility and

---

[1] Canos replaced Mike Smith in February 2008 as the supervisor of the College Hill residential units.
[2] Mincy's co-worker received a similar counseling memo.  (Canos Decl. ¶ 12, Ex. 4)

[3] "Blurbs" are detailed written records of the activities on the unit for each patient on each shift of the day.  The written report is to be reviewed after the oral change of shift report.  (Canos Decl. ¶ 5)

overall effectiveness of the Residential team.  **It must not happen again.**

> CORRECTIVE ACTION
> **You will attend and actively participate in report with the prior shift, and make sure you know the status of each client to whom you are assigned.**  If you have questions or concerns about any client's status, or the information/ records associated with that client, you will first seek out the Lead MHS, if unavailable, then Rodolfo Canos, and if unavailable then Theresa Broerman, or if unavailable, then the Administrator on Call to get your questions answered.  (Pl. Dep. Ex. 15)

Mincy also received that day a disciplinary warning for yelling at her co-workers in violation of the Hospital's CARES standards and for sending an email to more than 100 co-workers containing explicit racial graffiti written by patients.  (Pl. Dep. 263, 277, 296, Ex. 23)

> **F.     Less Than 24 Hours After Her Verbal Counseling, Mincy Documents That A Patient Who Was Not Physically On The Unit At Any Time During The Shift Slept Without Difficulty And Got Up For A Code Red.**

Mincy reported to work at 11:00 pm on September 18, 2008, less than 24 hours after receiving counseling from Canos and Broerman for "not reading the blurbs" and "not check[ing] the [patient's] room to confirm [the patient's] presence."  (Pl. Dep. Ex. 15)  Despite this warning, Mincy documented in another patient's medical record that the patient had slept without difficulty and had gotten up for a code red.[4]  (Pl. Dep. 320)  The patient, however, was <u>not</u> on the residential unit, and had not been there at any time during Mincy's shift or the prior shift. (Broerman Dep. 160-61)  As communicated in oral report and in the blurbs, the patient had been transferred to the inpatient unit.  (Broerman Dep. 134-35)  Mincy did nothing to confirm the presence of the patient.  (Pl. Dep. 329)  She did not even verify that there was a body in the room.  (Pl. Dep. 330)  She simply *assumed* that the patient was sleeping, *assumed* the patient

---

[4] A "code red" is a fire emergency that requires actions such as immediate evacuation of patients in the area in which the code red is occurring.  (Canos Decl. ¶ 6)

went out for the code red fire emergency, and then documented her assumptions in a medical record.  (Pl. Dep. 327-328)  Mincy did not even look at the patient names on the medical records she completed.  (Pl. Dep. 317-319)  She just flipped through the charts and wrote the same thing on each one without ever knowing on whom she was documenting.  (Pl. Dep. 317, 340)

The first shift staff discovered Mincy's progress note the following day and placed it in Supervisor Canos's office.  (Pl. Dep. 320)  One staff member telephoned Mincy to tell her of the discovery.  (*Id.*)  Mincy alerted her third-shift co-worker, Dawson, and then called the unit to ask another co-worker to locate and "shred" the record.  (Pl. Dep. 321)  The co-worker notified management of Mincy's inappropriate request that she destroy the progress note.  (Broerman Dep. 131, 138)

Management suspended Mincy and began an investigation with assistance from Human Resources Representative Marilyn Martin.  (Broerman Dep. 142)  The investigation revealed that Mincy had been told during the oral change of shift report that the patient she had documented on was in the inpatient unit.  (Broerman Dep. 134-35)  Management also confirmed that the "blurbs" for that day/evening shift documented that the patient was not on P2 South but in the inpatient unit.  (Broerman Dep. 134; Canos Decl. ¶ 6, Ex. 2)

Broerman and Martin met with Mincy to hear her explanation for documenting on a patient who was not physically present on the unit.  (Pl. Dep. 337-38)  Mincy stated that she did not check the names on the progress sheets when she completed them; she just wrote the same thing on each one.  (Pl. Dep. 340)  She took no responsibility for documenting that a patient who was not on the unit was "asleep throughout the shift w/out difficulty" and was "up for code red." (Pl. Dep. 339; Canos Decl. ¶ 6, Ex. 1)  Instead, Mincy blamed Dawson because Dawson had placed a sticker with the patient's name on a blank progress sheet.  (Pl. Dep. 347)

### G.  Mincy Is Discharged For Negligently Performing Her Duties.

On September 30, Broerman and Martin met with Mincy to inform her that her employment was terminated for negligently performing her duties.  (Pl. Dep. 344-45, Ex. 25)  At the close of the meeting, Broerman prepared to escort Mincy from the building.[5]  (Pl. Dep. 348)  Mincy told Martin, in a menacing tone, that she would "highly advise against leaving her alone" with Broerman at that time.  (Pl. Dep. 349)

### H.  Mincy Protests Her Termination But Does Not Show Up For The Appeal Conference.

Mincy protested her termination using the Hospital's Conflict Resolution Process.  (Pl. Dep. 359)  She met with HR Representative Erinn Gordon and provided the reasons for her protest.  (*Id*.)  Gordon investigated the circumstances surrounding the discharge, and the decision to terminate Mincy's employment was upheld at the first level of review.  (*Id*., 360)  Mincy, as outlined in the policy, requested a higher level review of the decision.  She was scheduled to meet with a Senior Area Administrator, but did not show up for the meeting or pursue her appeal further.  (*Id*., 367-68)

### III.  ARGUMENT

### A.  Mincy's Race Discrimination Claims Fail As A Matter Of Law.[6]

To survive summary judgment, Mincy must make a prima facie case of discrimination by demonstrating that she was replaced by a non-protected individual or that she was treated less favorably than a similarly-situated non-protected worker.  *Mitchell v. Toledo Hosp*., 964 F.2d

---

[5] Access to the building, elevators and units is restricted.  Mincy could not depart the building without an escort because she no longer had her badge or keys.  (Canos Decl. ¶ 7)

[6] Discrimination claims brought under § 1981 and Ohio law are subject to the same analysis used in Title VII claims. *Norbuta v. Loctite*, 181 F.3d 102 (6th Cir. 1999); *Bucher v. Sibcy Cline, Inc.,* 137 Ohio App. 3d 230, 239, 738 N.E.2d 435, 442 (Ohio Ct. App. 2000) (Ohio courts examine state discrimination claims under federal case law interpreting Title VII.)  *Noble v. Brinker Int'l.,* 391 F.3d 715, 720 (6th Cir. 2004).  Mincy's race discrimination, harassment, and retaliation claims under § 1981 and Ohio law fail for the same reasons her Title VII claims fail and therefore are not addressed separately.

577, 582 (6th Cir. 1992). Mincy was not replaced; her scheduled hours were dispersed among approximately 20 existing staff members. (Canos Decl. ¶ 8) Thus, to make her prima facie case, Mincy must show that non-African Americans who were similar to her in "all of the relevant aspects" received more favorable treatment. *Ercegovich v. Goodyear Tire and Rubber Co.,* 154 F.3d 344, 353 (6th Cir. 1998); *Mitchell*, 964 F.2d at 583.

There is no evidence that a non-African American employee was not terminated for negligently charting on a discharged or transferred patient after receiving a warning for the same misconduct less than 24 hours earlier, but was not terminated. Consequently, Mincy cannot establish as a matter of law that she was treated less favorably than a similarly situated non-African American employee so she cannot make a prima facie case of race discrimination. *Noble*, 391 F.3d at 728.

### 1.     There Is No Evidence Of Pretext.

Assuming Mincy could make a prima facie case of race discrimination, she has no evidence from which a rational fact finder could conclude that Children's Hospital's legitimate, non-discriminatory reason for terminating her employment -- management's judgment that she was negligent in performing her duties and that she had inappropriately requested that a co-worker shred a medical record -- is false, ***and*** that the reason was a pretext for intentional discrimination. Mincy cannot establish pretext because she cannot show that (1) the proffered reason has no basis in fact; (2) the proffered reason did not actually motivate the decision; or (3) the proffered reason was insufficient to motivate the decision. *Manzer v. Diamond Shamrock Chem. Co.,* 29 F.3d 1078, 1084 (6th Cir. 1994).

Mincy does not deny that she twice documented in patient records that the patients were physically present on the unit when they were not. (Pl. Dep. 224-25, 320) She admits her supervisor directed her that "all clients are to be checked on physically during the night shift.

That means opening doors and going in rooms. Looking at names on the board and assuming they are there is unacceptable." (Pl. Dep. Ex. 14) She admits she received counseling on September 18, 2008 in which she was told that "this must not happen again." (*Id.* Ex. 15) Despite the warning, Mincy admits that she again "assumed" a patient was in the unit (who was not and had not been) and documented in the medical record that the patient slept without difficulty and even got up for a fire drill. (Pl. Dep. 327-28) When asked about the incident, Mincy admitted that she did not look at the names on the medical records when she completed them; she simply wrote the same note over and over without ever confirming the patient's physical presence on the unit. (Pl. Dep. 340) She also admitted that she asked a co-worker to locate and shred the document. (Pl. Dep. 321)

There is no evidence that the Hospital's decision to discharge Mincy was not reasonably based on the facts before it. After a thorough investigation, management concluded that Mincy's disregard for her supervisor's direction, her refusal to be accountable and take responsibility for her actions, and her disregard for the safety and care of patients were sufficient to warrant discharge. There is no evidence that Children's Hospital's reasons were false and that Mincy's race motivated the decision to terminate her employment. There is no issue of material fact and summary judgment should be granted on Mincy's state and federal race discrimination claims.

### D. Mincy's Hostile Environment Claims Fail As A Matter Of Law.

Mincy cannot survive summary judgment on her race harassment claims because she cannot show that the alleged harassment unreasonably interfered with her work performance by creating an environment that was intimidating, hostile, or offensive, and because she cannot establish employer liability. *Clay v. United Parcel Service, Inc.*, 501 F.3d 695, 706 (6th Cir. 2007).

1. **Mincy Cannot Establish That The Alleged Harassment Was Severe And Pervasive Enough To Interfere With Her Work Performance.**

Mincy must present evidence proving that "under the 'totality of the circumstances' the harassment she alleges was 'sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment.'" *Id*. at 707, citing *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999). The "severe and pervasive" test is both subjective and objective and requires the Court to consider the frequency and severity of the alleged conduct, whether the conduct was physically threatening or humiliating, and whether the conduct unreasonably interfered with Mincy's work performance. *Id*. "[C]onduct must be extreme to amount to a change in the terms and conditions of employment. . . ." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). "[O]ff-hand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Lovelace v. BP Products N.A.*, 252 Fed. Appx. 33, 40 (6th Cir. 2007).

The Sixth Circuit has consistently ruled, as a matter of law, that conduct much more egregious than that alleged by Mincy was not sufficient to support a hostile environment claim. In *Smith v. Leggett Wire Co.*, 220 F.3d 752 (6th Cir. 2000), an African-American employee alleged (1) his co-workers threatened him by saying "You're (sic) nigger ass ain't going to work here;" (2) his supervisor circulated a racially discriminatory lewd cartoon depicting "an African-American man with a rope around his neck and connected to his penis standing in front of a Caucasian woman, entitled 'How a Black Man Commits Suicide;'" (3) he overheard his supervisor telling a joke using the "N word;" and (4) he overheard a foreman refer to a black employee as a "gorilla." *Id*. The court held that this conduct was "simply not 'severe or pervasive enough' to create an objectively hostile work environment because '[r]acial animus cannot be inferred from a handful of discriminatory comments by low-level employees, most of

which were not directed at [Plaintiff].'" *Id.* at 760. *See also Long v. Ford Motor Co.*, 193 Fed.

Appx. 497, 502 (6th Cir. 2006) ("utterly deplorable" conduct directed to Hispanic and African-

American plaintiffs, including the use of the terms "wetback," "Puerto Rican Spic," "Black son

of a bitch," "Black bastard," and the "N word" did not constitute a hostile environment because

the incidents were discrete and isolated); *Bourini v. Bridgestone/Firestone N.A. Tire, LLC*, 136

Fed. Appx. 747, 750-51 (6th Cir. 2005) (holding that eight incidents of harassment directed at a

Muslim plaintiff in five years, including co-workers' comments that plaintiff was a "camel

jockey and that plaintiff should be "packed up . . . in a box and [sent] back to his country," along

with racist graffiti, were insufficient to establish a hostile work environment based on national

origin).

Mincy's allegations are not sufficient to establish severe or pervasive harassment. She

testified without specificity as to time, place or person, that the teenage patients (typically

African-American) suffering from severe psychiatric and mental health disorders used the "N

word" when communicating with each other. (Pl. Dep. 180) Mincy also testified that on

September 3, 2008, she saw the phrases "niggas for life" and "ace boon coons" written amidst

other graffiti covering the dry erase boards on the doors of two African-American patients.[7] (Pl.

Dep. 249) Mincy testified that some time before 2008, a co-worker told her an African-

American patient called a Caucasian patient a "nigger" and that she heard a patient sing the lyrics

to a rap song that contained the "N" word. (Pl. Dep. 162-63, 183) Mincy also testified that a co-

worker once showed her a picture of an African-American family on the internet. (Pl. Dep. 212)

And, Mincy testified that she once heard a patient who had been given a snack thank a staff

member by saying "my nigger." (Pl. Dep. 185) There is no evidence that racial epithets were

ever directed at Mincy by patients or co-workers. The incidents of alleged racial harassment

---

[7] The patients wrote the graffiti themselves. (Canos Decl. ¶ 9)

described by Mincy were isolated; they are not sufficiently severe or pervasive to create an abusive or hostile work environment, as a matter of law. *See Smith*, 220 F.3d at 760.

Mincy's racial harassment claims also fail because there is no evidence that the alleged incidents of harassment altered the conditions of her employment or hindered her ability to perform her job duties. *See Lindsey v. Whirlpool Corp.*, 2008 WL 4428416 (6th Cir. 2008) (hostile work environment claim failed because plaintiff could not prove that "she was hindered from performing her duties as a result of" alleged harassment); *Vitt v. City of Cincinnati*, 97 Fed. Appx. 634, 638 (6th Cir. 2004) (same). Indeed, Mincy asserted in her Complaint that she "performed well <u>throughout</u> her employment." (Am. Cmpl. ¶ 8) (emphasis added)

### 2. <u>Mincy Cannot Establish Employer Liability.</u>

Even if the incidents alleged by Mincy were sufficiently severe and pervasive to create a hostile work environment, which they are not, to survive summary judgment Mincy must still prove that Children's Hospital is liable for the alleged harassment. To establish the Hospital's liability, Mincy must produce evidence proving that Children's Hospital "tolerated or condoned" the alleged conduct. *Smith*, 220 F.3d at 760 (6th Cir. 2000). In other words, Mincy must establish that the Hospital "knew or should have known of the alleged conduct <u>and did nothing to correct the situation</u>." *Id.* (emphasis added).

It is undisputed that the clinical staff addressed the use of racial slang directly with the psychiatric patients. (Sorter Dep. 16-17) It is also undisputed that staff members were instructed to redirect patients who used racial slang. (Broerman Dep. 30-34) Mincy admits that management had been directing staff to erase inappropriate graffiti. (Pl. Dep. 276) Immediately after the patient graffiti incident of September 3-4, Children's Hospital sent a reminder to all College Hill employees that racial harassment and discrimination were not tolerated. (Pl. Dep.,

Ex. 19)  Management also held an all-staff meeting to reiterate the Hospital's policy and to allow

staff to raise any concerns about the work environment.  (Sorter Dep. 34; Broerman Dep. 144-

45)  No further incidents of racial graffiti were reported.  (Canos Decl. ¶ 10)

Children's Hospital addressed the use of racial slang by patients in a therapeutic manner

consistent with the patients' mental health diagnoses.  The fact that Mincy disagreed with the

Hospital's approach and wanted the patients who used slang to suffer punitive consequences for

their language does not prove that the Hospital did nothing to correct the situation.  There is no

issue of material fact as to Mincy's race harassment claims and summary judgment should be

granted.  *Pelt-Washington v. Fresnenius Med. Care*, 2007 WL 1488837 (N.D. Fla. 2007)

(summary judgment granted for employer where plaintiff was unable to rebut evidence that

defendant admonished patients and developed behavior plans for their use of racial slurs)

**E.    Mincy's Retaliation Claims Fail As A Matter Of Law.**

Mincy's Title VII, § 1981 and state-law retaliation claims also fail as a matter of law.

Assuming for purposes of this motion that Mincy can make a prima facie case, her retaliation

claims fail because there is no evidence that the legitimate non-retaliatory reason for her

termination was pretextual and that the real reason was retaliation for engaging in protected

activity.  Mincy's negligent performance of her duties -- failing to confirm that a patient was

physically present, documenting that the patient slept through the night and got up for a fire drill,

and requesting that the medical recorded be shredded -- was based on fact and was sufficient

reason to terminate her employment.  *Majewski v. Automatic Data Processing Inc.*, 274 F.3d

1106, 1116 (6th Cir. 2001) (poor job performance was a legitimate non-discriminatory reason for

employee's discharge).  There is no evidence that a similarly situated employee, who did not

engage in protected activity, documented that a transferred patient was present on the unit the

<u>same</u> night he/she received verbal counseling for previously failing to confirm a patient's presence but was not terminated.

Mincy presumably will contend that she was retaliated against for sending an email on September 4 to over 100 non-management employees describing with explicit language the patient graffiti she observed.  Mincy cannot use her email as a shield against termination.  As stated by one court, "Title VII serves the laudable goal of protecting employee access to agencies and courts.  It does not shield employees from normal sanctions for misconduct."  *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 366 (4th Cir. 1985), *abrogated on other grounds by, Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).

Mincy offers no evidence of retaliatory motive against her.  Indeed, she testified she had "no facts" showing that she was retaliated against for raising concerns about race.  (Pl. Dep. 389-90)  A court cannot rely on Mincy's subjective belief when ruling on summary judgment.  Fed. R. Civ. P. 56(e); *Moore v. Holbrook*, 2 F.3d 697, 699 (6th Cir. 1993).  The mere fact that the email was close in time to her discharge for documenting for the second time that a patient not present in the unit slept throughout the night is not sufficient to establish pretext.  *Steiner v. Henderson*, 121 Fed. Appx. 622, 626-27 (6th Cir. 2005).

### F.    Mincy's Disability Discrimination Claims Fail As A Matter Of Law.

Mincy cannot survive summary judgment on her state and federal disability discrimination claims because she cannot demonstrate that she was disabled.  *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 553 (6th Cir. 2008).  To be "disabled" under the ADA, an individual must have a physical or mental impairment which substantially limits her in at least one major life activity, or have a record or be regarded as having such an impairment.  42 U.S.C.

§ 12102(2).[8] Mincy claims that she was disabled by depression. (Pl. Dep. 387-88) But her depression did not substantially limit any major life activity. (Pl. Dep. 388) Mincy testified that although her medication sometimes caused her to be tardy for work, her depression never affected her performance. (Pl. Dep. 134, 388) Under these circumstances, Mincy cannot show that she was "disabled" as the term is defined in the ADA. *Greathouse v. Westfall*, 212 Fed. Appx. 379, 382-83 (6th Cir. 2006) (general statements about sleeping problems do not show a substantial limitation of a major life activity); *McWilliams v. Jefferson County*, 463 F.3d 1113, 1116-17 (10th Cir. 2006) (plaintiff who alleged that depression caused "difficulty in sleeping" not disabled where limitations did not prevent her from performing her job or affect any other major life activity).

Even assuming Mincy could make a prima facie case of disability discrimination, she has no evidence from which a rational factfinder could conclude that Children's Hospital's articulated business reason for terminating her employment is false **and** that disability discrimination was the real reason. *See Reeves*, 530 U.S. at 142; *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 510-11, 515 (1993). To show that Children's Hospital's reason is false, Mincy must establish that a discriminatory reason more likely motivated the Hospital or that the Hospital's explanation is unworthy of credence. *Manzer v. Diamond Shamrock Chemical Co.*, 29 F.3d 1078, 1082 (6th Cir. 1994).

As shown above, Mincy does not dispute that she twice documented the presence of patients who were discharged or transferred from her unit. Mincy also has no evidence that a similarly situated, non-disabled employee engaged in the same negligent conduct as her, but was

---

[8] The ADA Amendments Act of 2008 ("ADAAA") does not apply to alleged discrimination that occurred before the January 1, 2009 effective date. *Milholland v. Sumner County Bd. Of Education*, 569 F.3d 562, 565 (6th Cir. 2009). The ADAAA has no application to this case because it was filed in 2008, and all the relevant events took place before Mincy's termination in October, 2008.

treated more favorably.  Mincy's only evidence to support her claim is an alleged remark made seven months prior to her discharge.  Even accepting as true Mincy's testimony that Broerman referred to her as a "psych patient"[9] (Pl. 134-35), such evidence is not sufficient to show that the reason for her discharge was false and the real reason was disability discrimination.  *Chappell v. GTE Products Corp.*, 803 F.2d 261, 268 n. 2 (6th Cir. 1986) (vague, ambiguous and isolated comments are not discrimination).

### G. Mincy's Public Policy Claims Fail As A Matter Of Law.

Mincy alleges that she was wrongfully discharged in violation of Ohio public policy for allegedly complaining about a discriminatory treatment environment, an unsafe workplace and an unsafe treatment environment.  Mincy cannot survive summary judgment on any of these claims.

Mincy cannot maintain a common law public policy claim based on alleged complaints of discriminatory treatment of patients because such complaints are protected by O.R.C. § 4112.02(G), and the existing statutory remedies adequately protect society's interests.  *Leininger v. Pioneer Nat'l Latex*, 115 Ohio St. 3d 311, 319 (2007) (no common law public policy claims where an adequate remedy is available in Ohio Rev. Code Chapter 4112).  Section 4112.02(G) prohibits discrimination on the basis of race in any place of public accommodation, and also prohibits retaliation for opposing conduct believed to be in violation of that statutory provision. Even assuming Mincy complained about discriminatory treatment, O.R.C. § 4112.02 provides an adequate remedy for such alleged retaliation and her public policy claim must be dismissed. (*Id.*)

Mincy also alleges she complained about workplace and patient safety.  Assuming she did, she cannot survive summary judgment on her public policy tort claims based on such

---

[9]  Mincy testified that she was a psychiatric patient at the time.  (Pl. Dep. 135)

complaints. In order to prevail, Mincy must prove that: (1) a clear public policy exists; (2) dismissing employees under circumstances like those involved in her dismissal would jeopardize the public policy; (3) her dismissal was motivated by conduct related to the public policy; and (4) the Hospital lacked an overriding legitimate business justification for her dismissal. *Collins v. Rizkana* (1995), 73 Ohio St.3d 65, 69-70.

Mincy cannot prove the third and fourth elements of her public policy claims. Mincy was terminated because she was negligent in carrying out the responsibilities of her position; she did not confirm the status of the patients she was assigned and she did nothing to determine whether her patients were physically present on the unit. Instead she assumed a patient was in the room and, without looking at the names on the medical records before her, she documented that a patient, who was transferred to another unit well before her shift began, had slept without difficulty and had even gotten up for a fire drill.

Even assuming Mincy made complaints about safety, the mere fact that an employee complains about safety is not sufficient to prove causation. *McDermott v. Continental Airlines, Inc.*, 2008 WL 1766892, *13-15 (S.D. Ohio 2008). Like the plaintiff in *McDermott*, Mincy testified that she raised safety concerns over the course of several years. There was no evidence that she was disciplined or even criticized for raising her concerns. Just as the court held in *McDermott*, Mincy's alleged complaints were not the cause of her termination, because "if they had been, [s]he would have been terminated much sooner." *Id.* at *15.

Mincy's public policy claims also fail because the evidence establishes that Children's Hospital had an overriding business justification for her dismissal. Mincy did nothing to confirm the physical presence of patients assigned to her. (Pl. Dep. 330) She admits she "assumed" there was a patient in a room even if all she saw in the bed was a pile of sheets and not a body. (*Id.*,

327-28)  She further admits that she documented the patient's presence without even looking at the names on the charts she completed.  (*Id*., 317-319, 340)  Mincy's conduct jeopardized the safety of patients.  Children's Hospital had an overriding business justification for her dismissal and her public policy claims must be dismissed.

### H.    Mincy's Defamation Claims Fail As A Matter Of Law.

Mincy cannot survive summary judgment on her defamation claims because the alleged defamatory statements, even if made, are protected by a qualified privilege.  A communication made in good faith on a matter of common interest between an employer and an employee, or between two employees concerning a third employee is protected by qualified privilege.  *Knox v. Neaton Auto Prod. Mfg., Inc.*, 375 F.3d 451, 460-61 (6th Cir. 2004).  Mincy testified that the complained-of communications were made internally to Children's Hospital management, Human Resources, and Security.  (Pl. Dep. 382; Am. Cmpl. 5)  She has no evidence that the statements were made externally or for an improper purpose.  *Hahn v. Kotten*, 43 Ohio St. 2d 237, 243, 331 N.E.2d 713, 719 (1979) (qualified privilege attaches where the publication is made in a reasonable manner and for a proper purpose).

The qualified privilege protecting the complained-of communications can only be defeated by a "clear and convincing" showing that the communications were made with knowledge that the statements were false or with reckless disregard as to their truth or falsity.  *Jacobs v. Franks*, 60 Ohio St.3d 111, 116, 573 N.E.2d 609, 614 (1991) (stating the actual malice standard).  Mincy has no evidence to show that Broerman knew the complained-of statements were false or acted with actual malice.  Mincy's defamation claims fail as a matter of law and should be dismissed.

## I.    <u>Mincy's FMLA Claim Fails As A Matter of Law.</u>

Mincy has no evidence that her use of intermittent FMLA leave over several years of her employment motivated her discharge.  Her FMLA claim must be dismissed.  From 2004 until her termination in 2008 Mincy applied for and received approval for six intermittent FMLA leaves. (Canos Decl. ¶ 13)  Mincy admits that she received all of the leave to which she was entitled. (Pl. Dep. 57, Ex. 10, 11, 12)  She contends that sometime prior to 2008, she overheard a former supervisor say that something had to be done about intermittent leaves but she admits the comment was not directed toward her or associated with any of her leaves.  (Pl. Dep. 372)  Such a vague and isolated remark, even if true, is not sufficient to satisfy the causation element of her prima facie burden.  Nor is it sufficient to show that the reason for her discharge (negligent performance of her duties) was false and the real reason was her use of intermittent FMLA leave. Summary judgment should be granted on Mincy's FMLA claim.  *See McConnell v. Swifty Transp. Inc.*, 198 Fed. Appx. 438, 443 (6th Cir. 2006) (affirming summary judgment where plaintiff failed to establish that employer's honestly held belief of employee's misconduct was a pretext for discrimination under the FMLA).

### III.  CONCLUSION

For each and all of the foregoing reasons, Defendant Cincinnati Children's Hospital Medical Center respectfully submits that it is entitled to summary judgment as a matter of law on all claims against it and Plaintiff's Amended Complaint should be dismissed in its entirety.

Respectfully submitted,

s/ Timothy P. Reilly
Timothy P. Reilly (0018507)
Paula J. Dehan (0076914)
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202-3957
(513) 381-2838
(513) 381-0205 (fax)
reilly@taftlaw.com
dehan@taftlaw.com

Trial Attorney for Defendant
Cincinnati Children's Hospital Medical
Center

## CERTIFICATE OF SERVICE

I hereby certify that on February 16, 2010, I electronically filed the foregoing Motion for

Summary Judgment of Defendant Cincinnati Children's Hospital Medical Center and

Memorandum in Support of Motion for Summary Judgment, with the Clerk of the Court using

the CM/ECF system, which will send notification of such filing to the following:

Martin McHenry
Haverkamp Rebold & Riehl Co., L.P.A
5856 Glenway Avenue
Cincinnati, OH  45238

s/ Timothy P. Reilly
Timothy P. Reilly (0018507)
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202-3957
(513) 381-2838
(513) 381-0205 (fax)
reilly@taftlaw.com

Trial Attorney for Defendant
Cincinnati Children's Hospital Medical Center