UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| MARIE MINCY, | : | CASE NO. 1:09CV065 |
| | : | |
| Plaintiff | : | Judge Dlott |
| | : | |
| v. | : | **PLAINTIFF'S MEMORANDUM IN** |
| | : | **OPPOSITION TO DEFENDANT'S** |
| CINCINNATI CHILDREN'S HOSPITAL | : | **MOTION FOR SUMMARY** |
| MEDICAL CENTER, | : | **JUDGMENT** |
| | : | |
| Defendant. | : | |

## I. STATEMENT OF FACTS

### A.  Defendant Punishes Plaintiff For Complaining About Racial Slurs.

Plaintiff began her employment with Defendant in March, 2003.[1]  She worked throughout her employment as a mental health specialist.  Throughout her employment, she enjoyed positive and productive relationships with the vast majority of her co-workers.  She also received throughout her employment positive feedback from her various managers regarding the quality of her work performance.  She also received consistent raises.  (Pl. Dec. 2)

Plaintiff worked to ensure that she, her co-workers and their minor patients were provided a work and treatment environment that was both safe and free from racial hostility.  To that end, Plaintiff complained about what she considered a racially offensive work and treatment environment:  She complained repeatedly to her co-workers, and to her managers, including her immediate supervisor Rodolfo Canos, his predecessor Mike Smith, and Theresa Broerman, and to her supervisor, Michael Sorter, M.D., the Division Director of Child and Adolescent Psychiatry, and to representatives of Defendant's Human Resources Department, including

---

[1]   This Statement of Facts is taken from the depositions of Plaintiff, her supervisor Rodolfo Canos, his supervisor Theresa Broerman, Marilyn Martin, Michael Sorter, M.D., Susan Phoenix, Yvonne Dawson Behnass and Joe Dennemann, the exhibits to these depositions, Plaintiff's declaration, and Defendant's interrogatory answers.

Marilyn Martin and Ron McKinley.  She specifically complained about the use of racially offensive language by her co-workers and patients.  (Pl. 160-71, 179-96, 199-205, 212-14, 217-18, 221-23, 280-85) (Phoenix 17-28) (Canos 18-19) (Sorter 5, 10) (Broerman 11-13, 60-61, 63) She also specifically complained to Martin shortly before her termination about the "inequality about the kids, the white kids versus the black kids, and the treatment that they were not getting." (Pl. 221-23)  Plaintiff also complained about the unsafe environment fueled in part by this racially offensive language.  (Pl. 66-74, 154-58, 168-69, 171, 180-82, 188-90, 214-21, 280-85) (Phoenix 17-18) (Def. Ex. 4) (Canos 22-24)  Plaintiff was not the only employee to complain about this environment.  Others complained as well.  (Pl. 160-61, 190, 205, 264-67) (Phoenix 29-54, 59-69, 73-93) (Phoenix Ex. 3) (Sorter 51-52) (Pl. Ex. 28) (Canos 19, 22, 25-26) (Broerman 27-29, 48-51, 63-64, 72, 76-77)  These complaints went unheeded.  (Pl. 82-94, 189-90, 195-96, 256-57, 274)

On the night of September 3, 2008, Plaintiff again endured this environment.  When she walked on the unit that night, she saw written in marker on one dry erase board "ACE BOON COONS" and on another "NIGGA'S for LIFE."  (Pl. 249) (Def. Ex. 16)  Plaintiff was both offended and disappointed that second shift personnel had allowed these racial slurs to remain on the unit.  (Pl. 249-54)

Later that night Plaintiff complained about this latest incident.  She sent an e-mail to the staff at the College Hill facility and copied James Anderson, Defendant's Chief Executive Officer.  (Pl. 254-55, 294-96) (Def. Ex. 16)

Management and Human Resources came down swiftly on Plaintiff for complaining about this latest incident.  Canos chastised her for voicing her complaint to Anderson and to employees outside the unit.  (Pl. 260) (Def. Ex. 17)  Broerman promptly "retracted" Plaintiff's e-mail from Defendant's GroupWise e-mail system.  (Pl. 263) (Broerman 58-59) (Def. Ex. 18)

-2-

She further warned Plaintiff that her e-mail "was met with a lot of concern today by administration." (Def. Ex. 18) Krista Keehne, another high-ranking manager, dismissed Plaintiff's e-mail as mere "clutter". (Pl. 269-71)

Dr. Sorter responded to Plaintiff's e-mail by sending an e-mail of his own to the College Hill staff in the Division of Psychiatry. (Pl. 271) (Def. Ex. 19) Dr. Sorter contends that before Plaintiff's e-mail no one had reported to him that racial slurs had been written on material on the unit and also contends that he was surprised by what she was alleging. (Sorter 19) He also professed concern that Broerman had told him that staff was upset by the racial material described in the e-mail and that she was acknowledging "that there was some racial division, some racial difficulties among the staff." (Sorter 20-21, 27) Dr. Sorter nevertheless criticized Plaintiff's use of Defendant's GroupWise e-mail system.[2/] (Def. Ex. 19) He concluded by inviting those with "any concerns or comments regarding this situation" to share their thoughts with him. (Def. Ex. 19)

Plaintiff responded in an e-mail to Dr. Sorter and asked her co-workers to respond as well. (Pl. 272-73) (Def. Ex. 20) She expressed to Dr. Sorter her frustration with the failure to implement changes to address what had been discussed "many times," including "the racial strife, division and slurs that consistently occur on the unit." (Def. Ex. 20) She also expressed repeatedly her concern about the lack of safety on the unit and the reasons for it. (Def. Ex. 20)

Broerman did not state in response to Plaintiff's or Dr. Sorter's e-mails that racial slurs would not be tolerated on the unit. She simply informed her subordinates that "no racial slurs should be allowed on the unit at this time." (Def. Ex. 21) (emphasis added) (Broerman 105, 108)

---

[2/]    Defendant's employees routinely use Defendant's GroupWise e-mail system to make announcements of a non-business nature. (Pl. 294-96) (Def. Ex. 20) There is no evidence that Defendant disciplines or otherwise criticizes any of its employees for such "clutter."

Plaintiff promptly complained to McKinley, the highest ranking of Defendant's Human Resources officials, about Broerman's curious equivocation: "This statement send (sic) the message that when eyes are not upon us, it will be business as usual and the slurs will be allowed back on the unit." (Def. Ex. 22) (Pl. 280)  Plaintiff also went to McKinley's office to voice her concerns.  (Pl. 280-84)  She shared with him the "racial issues" and generally what she had shared with Dr. Sorter.  (Pl. 280-81)  She advised McKinley that Defendant's rules and policies were "being ignored, which made the unit dangerous, unsafe for staff as well as clients."  (Pl. 281)  McKinley told Plaintiff he was concerned about what she had reported.  (Pl. 285)

Broerman formally disciplined Plaintiff for expressing in her e-mail her complaint about racial slurs on the unit.  (Pl. 288-90)  Broerman gave to Plaintiff on September 18, 2008 an "Employee Warning Notice," placing her on "First Written Warning."  (Def. Ex. 23) (Pl. 290)  Broerman specifically identified as a "problem and reason for the above action" Plaintiff's conduct of writing and widely disseminating "an e-mail about the incident" that occurred on September 3, 2008.[3/] (Def. Ex. 23)

### B.  Only After She Complains Does Defendant Belatedly "Counsel" Plaintiff For An Alleged Documentation Error.

In addition to giving Plaintiff a "written warning" for sending her e-mail, Broerman also gave her a "verbal counseling memo."  (Pl. 243-44)  This "counseling memo", though dated September 15, 2008, addressed an alleged documentation error allegedly made by Plaintiff about a month before, on August 22, 2008.  (Def. Ex. 15)

Defendant did not take any action to counsel Plaintiff about this alleged documentation error until *after* Plaintiff's September 4, 2008 e-mail.  On August 27, 2008, Canos sent to

---

[3/]    Broerman also falsely accused Plaintiff in this "notice" of having violated Defendant's "CARES Standards" by yelling at her co-workers that night.  (Pl. 292-93) (Pl. Dec. 7)  Plaintiff denied the accusation and tried to get Broerman to speak to a co-worker who was present that night and who was present when Broerman was administering the warning.  Broerman refused without explanation.  (Pl. 293)

Plaintiff an e-mail informing her that "[t]here were two third shift notes" on two separate occasions in August that she had written on a patient who had already been discharged. (Pl. 223-26) (Def. Ex. 14)  Canos did not inform Plaintiff then that he was even going to investigate the matter further or that Plaintiff's alleged conduct could subject her to counseling or disciplinary action.  (Def. Ex. 14)  In addition, Martin did not even log Canos' August 27 e-mail until September 4, the very day Plaintiff sent her e-mail. (Martin 49-53)

      **C.**    **After A "Town Hall Meeting," Defendant Discharges Plaintiff Allegedly For Conduct That It Knows Her Co-Workers Regularly Engaged In With Impunity.**

On September 18, 2008, Plaintiff worked the third shift with Yvonne Dawson. (Pl. 297-330)  When Plaintiff arrived, only one of the patients was not already in their room. (Pl. 297-98)

There was on the unit a census board that stated the names of the patients on the unit, their room numbers, social worker, doctor and privilege level. (Pl. 226-27)  The census board is the third shift staff's "up-to-date source of information." (Dennemann 17-20)  The lead on the second shift that night, Michelle Minnette, reported to Dawson and Plaintiff and confirmed, twice, that all of the information on the census board, including the names of the patients on the unit, was updated and accurate. (Pl. 299-300, 304-05) (Pl. Dec. 8) (Dawson 10-12, 22-24)  According to Minnette, the patient whom Plaintiff allegedly charted on in error was on the unit that night. (Dawson 11-12)

After Minnette left, Plaintiff and Dawson divided between themselves tasks to be completed during the shift.  Plaintiff did room checks. (Pl. 306-07) (Pl. Dec. 11) (Dawson 63-64)  Dawson prepared daily progress notes for the patients that Minnette had confirmed were on the unit.  (Pl. 306-07)  Dawson affixed to each note a label with the patient's name on it, including one for the patient Plaintiff allegedly charted on in error. (Pl. 306) (Dawson 21-24)  She then gave Plaintiff some of the notes.  Plaintiff then confirmed that the information on the

labels on the progress notes that she was given matched the information on the census board and door and also the number of people she checked on.  (Pl. 310, 315-19, 327, 328-29, 347) (Pl. Dec. 9)

A fire drill (code red) was called later that night and Dawson took all but one of the patients to a gymnasium.  (Pl. 311-13)  Plaintiff stayed with the one patient, who had been heavily medicated and was having difficulty awakening.  (Pl. 312) (Dawson 17-18)  Upon the drill being concluded (code green), Dawson returned with the patients and they went back to their rooms. (Pl. 313-14)

Thereafter, Dawson checked all the rooms.  (Dawson 26-27) (Pl. 309-10, 314)  She did not report to Plaintiff that there was not a patient in one of the rooms that Minnette and the census board had indicated, nor did she report that the patient who was allegedly not there was not there.  (Dawson 27)  To the contrary, the number of progress notes that she had prepared matched the number of bodies that she saw in the rooms.  (Dawson 73-74)

At the end of their shift, Dawson and Plaintiff completed their progress notes.  Having observed nothing exceptional that night with any of the patients on the unit and having confirmed by Minnette and the census board that the patients whose progress notes she completed were in fact on the unit, Plaintiff completed all of the progress notes in the same way. (Pl. 317-19) (Pl. Dec. 10, 12)

The next day Plaintiff was informed by co-workers that she had allegedly completed a progress note on a patient who was not on the unit the previous night.  (Pl. 320)  Dawson confirmed that the identified patient corresponded to one of the notes that she had given Plaintiff. (Pl. 320-21)  Plaintiff then called the unit and spoke with Minnette.  (Pl. 325)  Because the third shift staff is the first to prepare a daily progress note on a patient, Plaintiff was concerned that if the note was not taken out of circulation, another staff member on a different shift would also

write on the note and, if that note corresponded to a patient who was indeed not on the unit, thereby perpetuate a mistake. (Pl. 331) (Dawson 21, 28) Plaintiff expressed her concern to Minnette and Minnette simply told her that she would look for the note and thanked her for calling and letting her know. (Pl. 331)

Thereafter, Plaintiff received at her home an Employee Warning Notice, dated September 22, 2008. (Pl. 33-34) (Def. Ex. 24)

On September 24, 2008, while Plaintiff was still on suspension, Defendant convened a "town hall meeting." (Dennemann 7) Those attending included Broerman, Canos, Martin and Dr. Sorter, as well as various staff members, including Joe Dennemann, a long-term mental health specialist who had worked third shift on Plaintiff's unit, who like Plaintiff reported to Canos, and who according to Broerman had a good reputation, was hardworking, trustworthy and knowledgeable, and Susan Phoenix, a licensed practical nurse who also reported to Canos. (Dennemann 5-6, 8) (Phoenix 12-13) (Broerman 143-45, 155-56) The meeting was convened by Dr. Sorter to address the racial issues raised by Plaintiff and also "night-shift duties in general." (Dennemann 49-50)

Staff, including Dennemann, impressed upon Broerman, Canos, Martin and Dr. Sorter that the procedures and systems that they had put in place ensured charting errors. (Pl. Ex. 41) (Dennemann 9, 24-26) (See generally Dennemann 9-21, 24-32) (Broerman 146-49) Specifically: The third shift staff had no confidence that they really knew who was on the unit at any given time (Dennemann 10-13); Defendant's computerized reporting system often provided inaccurate information about patients and whether or not they were on the unit (Dennemann 11-13); oral reports from those responsible for providing them, the lead mental health specialists on the prior shift (like Minnette), often included inaccurate information, including the identities of those on the unit (Dennemann 13-15). According to Canos, Dennemann specifically emphasized that

-7-

documentation errors on the third shift could be expected to result from the difficulty in determining during a  room check whether "a pile of clothes on the bed" was indeed a patient. (Canos 77-79)

Dennemann then specifically addressed the very conduct for which Plaintiff was allegedly suspended and eventually terminated.  He stated that he was personally aware that he and indeed a majority of the staff had incorrectly charted that a patient was either present or not present on the unit when the opposite was true. (Dennemann 26)  Dennemann also specifically addressed the suggestion that Plaintiff had behaved inappropriately by asking Minnette to remove from circulation i.e. "shred" the allegedly inaccurate progress note.  He stated in no uncertain terms that as the night shift is the first to chart on the daily progress notes, when this type of error is caught, the generally accepted means of correction is to shred the incorrect document. (Dennemann 27-28)  Dr. Sorter responded to these candid disclosures and admissions by summarily closing the meeting. (Dennemann 26-28)

The staff also echoed Plaintiff's complaints about the racial hostility on the unit. (Broerman 145)  Phoenix, for example, reported to those in attendance, as she had reported earlier to Broerman and Canos, that one of her co-workers had in her presence stated "you have to be brown or darker to be a nigger." (Phoenix 38-45)  Broerman, who had done nothing about this when Phoenix had reported it to her, denied at the meeting that she knew anything about it. (Phoenix 38-45)  Phoenix also complained about Dr. Sorter's declared insensitivity to the racial hostility on the unit.  At the meeting, Dr. Sorter stated that he had witnessed "the same type of writings on a client's door that said nigger, coon, etc." and that he chose to not erase the offensive language because after looking around, he determined that all of the staff working that shift and the patients were African American. (Phoenix 46-48)  The staff at the town hall

-8-

meeting expressed their support for Plaintiff's complaining about the racially offensive environment.  (Sorter 46)

Defendant thereafter fired Plaintiff.  Martin and Broerman gave to her a discharge notice, dated September 26, 2008.  (Pl. 344-48) (Def. Ex. 25)

### D.  Canos Admits That The "Reason" Offered Up By Defendant For Plaintiff's Termination Is Pretextual.

Shortly after Plaintiff's termination, Canos, who recommended to Broerman that Plaintiff be terminated and who discussed with her his recommendation, admitted to Dennemann that the "reason" for termination given by Martin to Plaintiff at the time, the "reason" given in the discharge notice, the "reason" advanced by Defendant in this action, is false.  (Canos 64, 82, 85, 115-16) (Broerman 83, 132) (Dennemann 32-36) (Def. Interrog. Ans. 2-3)  Dennemann met with Canos several times after the town hall meeting.[4/]  (Dennemann 31-32)  On October 1, 2008, Dennemann impressed upon him that the staff was extremely anxious because Plaintiff had allegedly been fired for charting errors.  (Dennemann 33-36)  Dennemann pressed the issue, again stressing that staff was very anxious, given Plaintiff's firing for alleged charting errors.  (Dennemann 35-36)  Canos responded by assuring Dennemann that neither he nor his "co-workers needed to worry about, that that was not the reason this employee had been terminated and, basically, that we did not have anything to worry about."  (Dennemann 35 l.21-36 l.16)

Canos went so far as to assert that Plaintiff "had been terminated for a number of other issues," including issues that arose before he (Canos) had been hired by Defendant.  (Pl. Ex. 42) (emphasis added) (Dennemann 32-33, 36)

---

[4/]    In one of those meetings, Dennemann raised again the issue of the propriety of disposing of an incorrect progress note prepared by the first person to chart on the patient i.e. the third shift.  (Dennemann 31-32) Canos confirmed that there was nothing wrong with disposing of such incorrect charting.  (Dennemann 31-32)

## II. ARGUMENT

### A. General Principles Applicable To Plaintiff's Claims.

"There are no hard and fast rules as to ... what evidence is needed to establish pretext." *Rowe v. Cleveland Pneumatic Co.*, 690 F.2d 88, 97 (6th Cir. 1982). "One way in which a plaintiff may demonstrate pretext is by showing that the reason given by the employer 'is ultimately found to be mistaken, foolish, trivial, or baseless.'" *Clay v. United Parcel Service, Inc..*, 501 F.3d 695 (6th Cir. 2007) (citation omitted). All evidence of pretext must be analyzed together, not in isolation. *Thurman v. Yellow Freight System, Inc.*, 90 F.3d 1160, 1166 (6th Cir. 1996), *opinion amended by* 97 F.3d 833 (6th Cir. 1996).

Evidence sufficient to support a finding that a defendant's "explanation is unworthy of credence," i.e. "pretextual," is sufficient to support a finding of unlawful discrimination. No further evidence of discriminatory animus is required. *Reeves v. Sanderson*, 530 U.S. 133, 120 S. Ct. 2097, 2108 (2000). *See also Ross v. Campbell Soup Co.*, 237 F.3d 701, 708 (6th Cir. 2001).

When determining whether the evidence, including evidence of pretext, is sufficient to support a finding of unlawful discrimination, the jury need not find from the evidence that the plaintiff's protected status was the sole or even the most important factor in the defendant's decision. *See, e.g., Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1333-34 (6th Cir. 1994); *Hill v. Lockheed Martin Logistics Management, Inc.*, 354 F.3d 277, 284 (4th Cir. 2004).

### B. There Is Sufficient Evidence To Enable A Reasonable Jury To Find That Plaintiff's Protected Activity Of Complaining Of A Racially Hostile Work Environment Was A Motivating Factor In The Decision To Discharge Her. (Counts I, II, VIII)

Defendant assumes "for purposes of [its] motion that [plaintiff] can make a *prima facie* case" of retaliation under Title VII, Section 1981 and Ohio law. (Def. Memo. p.13) Temporal

proximity alone compels this "assumption": Plaintiff was fired shortly after complaining, again, of "the racial strife, division and slurs that consistently occur on the unit" not only in her September 4, 2008 e-mail, but also in her response to Dr. Sorter and in her meeting with McKinley. (Def. Ex. 20) Defendant limits its challenge to Plaintiff's retaliation claim to an alleged insufficiency of evidence of pretext.[5/]

There is more than sufficient evidence of pretext here:

Canos' admission to Dennemann is, <u>standing alone</u>, sufficient evidence of pretext. According to Canos, who recommended the termination of his subordinate Plaintiff and who explained his reasoning to Broerman, the "reason" offered up by Defendant at the time, the "reason" it continues to offer up to this Court, is <u>not</u> the true "reason" for Plaintiff's termination. <u>It is false</u>. Plaintiff was terminated because of "<u>other issues</u>." (Pl. Ex. 42) (emphasis added)

In addition, Defendant's argument rests on an assumption that is unfounded. Defendant's allegation that Plaintiff was "negligent" during the third shift of September 18, 2008 is premised upon its further allegation that Plaintiff completed a progress note on a patient who was not on the unit. Defendant asks this Court to assume this "fact" is true. There is more than sufficient evidence, however, that this is false: Minnette, the lead responsible for reporting accurate information to the third shift, reported to Plaintiff and Dawson that the patient whom Defendant

---

[5/]   Plaintiff will vigorously resist any attempt by Defendant to slip into its reply memorandum any arguments that in fairness should have been presented in its initial memorandum. This Court's briefing procedure contemplates Plaintiff being afforded a reasonable opportunity to respond to Defendant's arguments in support of its motion. Sandbagging should not be allowed. Defendants routinely argue in reply memoranda that statements in declarations or affidavits "contradict" deposition testimony and therefore should be disregarded. Because defendants get the last word, plaintiffs do not have the opportunity to address allegations of "contradiction." When considering such an allegation, this Court should be guided by well-established law. The allegedly "contradicted" deposition testimony must be read not in isolation but together, and a declaration that simply supplements deposition testimony is appropriate. *See, e.g., S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 496 (5th Cir. 1996); *Soletro v. National Federation of Independent Business*, 130 F. Supp.2d 906, 910-11 (N.D. Ohio 2001).

contends was not on the unit was in fact on the unit. The accuracy of this report is consistent with the room checks conducted that night by both Plaintiff and Dawson.[6/]

Even if this Court accepts as true Defendant's "fact," that Plaintiff had documented on a patient who was not on the unit, there is more than sufficient evidence that Defendant's "negligence" reason was insufficient to warrant discharge:

Defendant knew before it fired Plaintiff that her co-workers had engaged in the conduct that allegedly caused it to fire her. Dennemann told this to Broerman, Canos, Martin and Dr. Sorter at the town hall meeting: He, as well as the majority of the staff, had incorrectly charted that a patient was either present or not present on the unit when the opposite was true. (Dennemann 26) Defendant did not respond to this admission by informing the staff in attendance that they would be subject to discipline if they were found to have done this. Defendant did not treat such conduct as a disciplinable offense. (Dennemann 26-27, 30)

Nor did it treat it as a disciplinable offense shortly after Plaintiff's termination. Dawson admitted that Canos was aware that she had charted on a patient who was not on the unit. (Dawson 33-35) Canos simply told her to be more careful going forward. (Dawson 34-35) He did not discipline her, nor did he tell her that if she ever did it again she would be fired, as Plaintiff was. (Dawson 33-34)

Defendant's treatment of Plaintiff's alleged "negligence" stands in stark contrast to its treatment of her co-workers: Defendant minimized the significance of such "negligence" for others; for Plaintiff it "skipped" all of its established levels of discipline, "first written warning,

---

[6/]    Defendant cannot establish as a matter of law this "fact" by referring to a "blurb." "Blurbs" were notoriously inaccurate. (Dennemann 45) In any event, a "blurb" is just another piece of evidence. It does not trump as a matter of law the contrary report given by Minnette. (Pl. Dec. 14)

second written warning, final written warning and ongoing final written warning," and went right to termination. (Martin 62, 66) (Pl. Ex. 23)

Put simply, a reasonable jury could conclude from the evidence that Defendant took advantage of a system fraught with error, for which it was responsible, to rid itself of an employee (Plaintiff) that it wanted gone for other reasons.[7] That Defendant's established procedures, to the extent there were any, promoted charting mistakes like the one that Plaintiff allegedly made, cannot be disputed. Defendant was informed of this at the town hall meeting. To the extent Defendant sought to formalize and improve these procedures, it did so only after Plaintiff's termination. (Dawson 36-37, 51) (Pl. Ex. 25) (Dennemann 51, 53-54) (Pl. 345-46) Whereas Plaintiff's co-workers, like those at the town hall meeting, like Dawson, were given the opportunity to work under an improved system, Plaintiff was summarily fired. Having chosen to blame Plaintiff and hold her accountable for a mistake that its established procedures encouraged, while not blaming or holding accountable others whom it knew had made the same mistake, Defendant behaved unreasonably. The jury's conclusion that Defendant behaved unreasonably would further support its conclusion that Defendant's "reason" for terminating Plaintiff was pretextual. *Wexler v. White's Fine Furniture*, 317 F.3d 564, 576-77 (6th Cir. 2003).

Defendant cannot escape this conclusion by referring to the "verbal counseling memo" that Plaintiff was given on September 18, 2008 for an alleged mistake she made on August 22, 2008. To the contrary, the circumstances of this "counseling memo" support this conclusion. Defendant did not act on an alleged concern over this alleged mistake until after Plaintiff's September 4 e-mail. When it did, it signaled its desire to get rid of Plaintiff: It prepared not a

---

[7] Broerman's conduct immediately before Plaintiff's termination reflects her zeal to get rid of her for reasons unrelated to any alleged charting mistake. Broerman was then actively soliciting Plaintiff's co-workers to send to her "any negative interactions which you have had with [Plaintiff] ASAP." (Pl. Ex. 24) (Broerman 173-74)

"counseling memo" but a discharge notice.[8/] (Pl. Exs. 7-8) (Broerman 80-81, 83) Furthermore, and even if it were to find the "counseling memo" was given because of a genuine concern, i.e. was bona fide, a reasonable jury could conclude that Plaintiff conducted herself thereafter in accordance with the "corrective action" that it described: "You will attend and actively participate in report with the prior shift, and make sure you know the status of each client to whom you are assigned." (Pl. Ex. 16) Plaintiff did "attend and actively participate in report with the prior shift" when she and Dawson listened to Minnette confirm the identities of those on the unit. She also engaged in conduct reasonably calculated to "make sure you know the status of each client to whom you are assigned": She not only relied on the information provided by Minnette, she conducted room checks.

Defendant's suggestion that Plaintiff violated this "corrective action" by not conducting room checks in a thorough enough manner is both misdirected and insupportable. Defendant appears to suggest that Plaintiff should have done more intrusive checks by, for example, using a flashlight to identify a sleeping patient. At no time, however, was Plaintiff ever told to do this, and to thereby risk traumatizing an already fragile patient. She was told just the opposite. (Pl. 226-34, 246, 327-29) She and her co-workers did not do this. (Dawson 65-67) Canos did not even suggest that Plaintiff's co-workers do this until after Plaintiff was already suspended pending termination. (Dennemann 51-54) The simple truth is that even a staff member performing a relatively intrusive check may nevertheless confuse what appears to be a sleeping form in a room with an actual body and thereafter proceed to prepare a progress note on a patient who was not in the room. (Dennemann 54 ll.8-17) This is precisely what Dennemann, the

---

[8/]     Only after it became apparent that Canos had falsely accused Plaintiff of a mistake made by a co-worker, Nicole Murray, did Defendant refrain from summarily discharging Plaintiff after her September 4 e-mail. (Pl. 244)

model mental health specialist, emphasized at the town hall meeting.    (Canos 77-79) (Dennemann 26)

Defendant's reliance on Plaintiff's request that Minnette take out of circulation the progress note that she allegedly completed incorrectly is as pretextual as its reliance on Plaintiff's alleged "negligence."  First, there is more than sufficient evidence that the request was not inappropriate much less a violation of an established policy warranting summary discharge: Plaintiff was the first to document on the note and therefore its being taken out of circulation, if it was indeed mistaken as alleged, had the beneficial effect of preventing another staff member perpetuating the alleged mistake by also documenting on the patient.  The managers responsible for Plaintiff's termination were informed at the town hall meeting that Plaintiff's request was not only appropriate but consistent with the generally accepted means of correction of such an allegedly incorrect note.  (Dennemann 27-28)    That would remain the accepted means of correction regardless of whether the staff member "shredded" the note before leaving his shift or requested another to do so after he left the shift.  (Dennemann 55-56)

In any event, Defendant's professed concern about Plaintiff's request did <u>not</u> motivate Plaintiff's discharge.  According to Canos, "that wasn't an issue."  (Canos 83)  Plaintiff's request did not motivate his termination recommendation.  (Canos 85)

In order to distract from the stark evidence of pretext in this record, Defendant offers an unduly restrictive "similarly situated" analysis.  To be "similarly situated" to another is to be similar to the other in "all of <u>the relevant aspects</u>," not each and every particular.  *Ercegovich v. Good Year Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998) (emphasis added)  Putting to one side the inflammatory and baseless "shredding" allegation addressed above, Defendant's "reason" for Plaintiff's termination is, according to Defendant's own discharge notice, simple negligence:  "Ms. Mincy was negligent in performing her duties with the degree of care

-15-

considered a reasonable expectation." (Pl. Ex. 23) A jury could reasonably conclude that Plaintiff was not "negligent" on the third shift of September 18, 2008: <u>If</u> she made a mistake, she made it despite her "performing her duties with the degree of care considered a reasonable expectation," and she made a mistake encouraged by Defendant's own systems failure, a mistake that Defendant understood full well a majority of her co-workers had made with impunity. A mistake, <u>if</u> one was made, does not equate to negligence.

Defendant's incantation of "negligence" appears particularly pretextual in light of its failure to discipline in any way those who were clearly "negligent" during the third shift on September 18, 2008. There is no evidence, for example, that Minnette, who had a duty to report correct information, including the identities of those patients on the unit, to Plaintiff and Dawson was disciplined for her alleged negligence. (Canos 93) Nor was Dawson, who prepared and presented to Plaintiff for completion a progress note on the patient who was allegedly not there and who, like Minnette, had a duty to provide correct information to Plaintiff. (Dawson 35) (Canos 91-93) Neither Dawson nor Minnette was disciplined for their "negligence"; Plaintiff was, even though Canos himself admits that the third shift may rely on information reported by Minnette as to who is on the unit. (Canos 96-97, 109-11) (Broerman 167)

### C. There Is Sufficient Evidence To Support Plaintiff's Public Policy Claims. (Counts VII, XI, XII)

Defendant does not dispute that public policy favors workplace safety, a safe treatment environment and a non-racially discriminatory treatment environment. Nor does it dispute that it fired Plaintiff shortly after she complained again that Defendant's workplace and treatment environment was racially hostile and unsafe.

Defendant contends only with respect to Plaintiff's unsafe workplace and treatment environment public policy claims that there is insufficient evidence from which a reasonable jury

could find that her termination was motivated by her complaints and that Defendant lacked an overriding legitimate business justification for her dismissal. In support of these contentions, Defendant offers only the same argument that the evidence establishes a matter of law that the true and only reason for Plaintiff's termination was Plaintiff's alleged "negligence." As demonstrated above, however, there is more than sufficient evidence to enable a reasonable jury to conclude that Defendant's "reason" for Plaintiff's termination is pretextual. A reasonable jury may conclude from this evidence of pretext that Plaintiff's complaints were a motivating factor in her termination. Of course, an employer does not have "an overriding legitimate business justification" for firing an employee not because of this alleged "justification," but because of her complaints.

Defendant's further defense to Plaintiff's discriminatory treatment public policy claim, that such a claim is effectively preempted by O.R.C. §4112.02(G), is improper, unfounded and ultimately self-defeating. Defendant did not include such a defense in the seven defenses included in its Answer to Plaintiff's Amended Complaint. In any event, even if this Court were to permit Defendant to now present this defense, it is unfounded: Defendant has cited no authority for the proposition that it is a "place of public accommodation" and the statutory language does not support an interpretation that it is. O.R.C. §4112.01(9). Even if it is, that conclusion would not warrant dismissal of Plaintiff's claim on the merits. At most, it would either require Plaintiff to bring such a claim under O.R.C. §4112.99 in a separate action or to amend the pending Amended Complaint to specifically include such a claim to address Defendant's belated defense.

### D. There Is Sufficient Evidence Of A Racially Hostile Working Environment For Which Defendant Is Liable.  (Count III, IV, IX)

Defendant correctly asserts that the totality of the circumstances must be considered in determining whether there is sufficient evidence of a racially hostile working environment. Plaintiff has cited above the evidence bearing on the totality of the circumstances of the environment that Plaintiff and her African-American co-workers endured.

Defendant is responsible for this environment.  As demonstrated above, the complaints of Plaintiff and her co-workers went unheeded and the environment was not effectively remedied. Furthermore, Defendant's management exhibited indifference to this environment, not a genuine desire to fix it.  Dr. Sorter admitted at the town hall meeting that racially offensive material would be condoned on the unit whenever the staff and patients were African American. (Phoenix 46-48)  Little wonder that one of the leads on the unit, Brian Strayer, found it appropriate to instruct African American staff to simply ignore (endure) racially offensive material on the unit.  (Phoenix 68-69)

### E. There Is Sufficient Evidence To Enable A Reasonable Jury To Find That Defendant Terminated Plaintiff Because It Regarded Her As Having A Disability.  (Count VI, X)

Broerman's deposition testimony, along with that of Plaintiff, supports a reasonable inference that Broerman regarded Plaintiff as having a mental impairment substantially limiting at least one major life activity.  Broerman admitted that she understood Plaintiff had been treated for a long time with medication for a mental health condition and that this treatment interfered with her ability to consistently get to work on time and that her condition prevented her from learning and taking on new tasks.  (Broerman 120-28)  These medications included sleep medications.  (Pl. 134)  Broerman's concern about Plaintiff's mental health prompted her to direct Plaintiff to follow up with Martin to look into going on Social Security disability.  (Pl.

129) (Def. Ex. 9)   When directing Plaintiff to explore Social Security disability, Broerman laughed at her and told her that she found it "hilarious" that Plaintiff worked in a job treating patients with psychiatric illnesses when she too was a "psych patient." (Pl. 133, 135-37, 371) Broerman also expressed frustration with the length and indefinite nature of Plaintiff's mental health condition. (Pl. 371) A reasonable jury could infer from all of this that Broerman regarded Plaintiff as being substantially limited in her abilities to think and learn, to sleep and to work. Specifically, the jury could reasonably infer from Broerman's suggestion that Plaintiff explore Social Security disability that she regarded Plaintiff as unable to work anywhere. The jury could also reasonably infer from Broerman's "hilarious"/"psych patient" comment that she considered Plaintiff substantially limited in her ability to work in any job providing psychiatric care to patients.   In addition, Plaintiff's perceived inability to take on new tasks renders Plaintiff, according to Broerman, unfit for any job in a hospital. (Broerman 128)

The evidence of pretext cited above would allow a reasonable jury to reject Defendant's negligence "reason" and infer that concern stemming from Plaintiff's ongoing "disability" motivated the decision to terminate her.   Such an inference would be consistent with Canos' admission to Dennemann that Plaintiff had been terminated for "issues dating back to even before [Canos] had been hired" in January 2008.[9] (Dennemann 32-33, 36) (Pl. Ex. 42) (Canos 5)

**F.    There Is Sufficient Evidence To Enable A Reasonable Jury To Find That Plaintiff's Intermittent FMLA Leave Was A Motivating Factor In The Decision To Terminate Her Employment. (Count V)**

The jury may also reasonably infer that Plaintiff's use of intermittent FMLA leave in connection with her ongoing treatment for depression was one of the "issues" identified by

---

[9]    The decision of whether or not to draw these inferences is properly made by a jury, not this Court on summary judgment. *See Ross v. Campbell Soup Co.*, 327 F.3d 701, 706 (6th Cir. 2001) (the question of whether the employer unlawfully "regarded" the plaintiff is "rarely susceptible to resolution at the summary judgment stage"); *Holihan v. Lucky Stores, Inc.*, 87 F.3d 362, 366-67 (9th Cir. 1996) (this Court's "obligation" now is to view the evidence bearing on the Defendant's state of mind "in the light most favorable to" Plaintiff).

Canos. (Pl. Dec. 4)  The compelling evidence of pretext is as applicable to Plaintiff's FMLA claim as it is to her other claims.  That evidence would permit the jury to infer that concerns stemming from Plaintiff exercising her rights under the FMLA motivated the decision to terminate her employment.  Such an inference would be buttressed by the fact that Broerman had in the past criticized Plaintiff for exercising those rights.  (Pl. 129-32) (Def. Ex. 9)

## III. CONCLUSION

For all the foregoing reasons, Plaintiff submits that Defendant's motion for summary judgment must be denied.

Respectfully submitted,

**MARTIN McHENRY (0022543)**
Trial Attorney for Plaintiff
HAVERKAMP REBOLD & RIEHL CO., L.P.A.
5856 Glenway Avenue
Cincinnati, OH 45238
Tele:   (513) 922-3200
Fax:    (513) 922-8096
e-mail: mmchenry@hrr-law.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 22, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:   Timothy P. Reilly, Esq. and Paula J. Dean, Esq., Attorneys for Defendant, Taft, Stettinius & Hollister, 1800 Firstar Tower, 425 Walnut Street, Cincinnati, OH 45202-3957.

**MARTIN McHENRY (0022543)**
Trial Attorney for Plaintiff

-20-