IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Marie Mincy, | : | |
| | : | Case No. 1:09-cv-065 |
| Plaintiff, | : | |
| | : | Chief Judge Susan J. Dlott |
| v. | : | |
| | : | ORDER GRANTING IN PART AND |
| Cincinnati Children's Hospital Medical Center, | : | DENYING IN PART DEFENDANT'S |
| | : | MOTION FOR SUMMARY |
| Defendant. | : | JUDGMENT |

This matter is before the Court on Defendant's Motion for Summary Judgment (doc. 22). Plaintiff Marie Mincy has sued her former employer, Defendant Cincinnati Children's Hospital Medical Center ("Children's Hospital" or "CHMC"), in this employment discrimination case. For the reasons that follow, the Court will **GRANT IN PART** and **DENY IN PART** CHMC's motion.

## I.      BACKGROUND

### A.      Factual History

The following facts were agreed upon by the parties in their Proposed Undisputed Facts and Responses thereto (docs. 22-2, 28-1), except where specifically noted otherwise.

#### 1.      Mincy's Employment Generally at Children's Hospital

Children's Hospital provides mental health treatment on a residential and inpatient basis at its College Hill campus to children and adolescents with severe cognitive, psychiatric and/or behavioral disorders. The patients admitted to the College Hill residential treatment center live on the unit from one to twelve months. The patients often come from abusive environments and receive treatments for pyschiatric disorders ranging from self-harming behaviors and

1

schizophrenia to bipolar disorder.

Plaintiff Marie Mincy was employed by CHMC at the College Hill campus as a Mental Health Specialist ("MHS").  She worked the third shift on the P2 South residential unit.  Her job duties included providing direct patient care, documenting patient care, communicating at shift changes with other MHSs and staff about patients, and maintaining a positive working relationship with staff.  (Mincy Dep. 36-39.)

**2.       Mincy's Mental Health and Employment History Through Spring 2008**

Mincy suffered from depression during her employment at CHMC.  Her medication sometimes caused her to be tardy for work, but it did not affect her work performance.  Mincy's depression did not prevent her from working.  (*Id.* at 388.)

From 2004 through 2008, Mincy applied for and received approval for six intermittent FMLA leaves.  Mincy received all the leave to which she was entitled.

In the early Fall 2007, Mincy and a co-worker, Yvonne Dawson Behnass, were called in by management after each complained about the other's behavior on the unit.

In October 2007, Mike Smith, Mincy's supervisor, asked her to take on the additional duty of auditing medical charts.  (*Id.* at 94-98, 124-25 & Ex. 7.)  Mincy believed auditing to be a volunteer task and she questioned Smith about why she was given the task when she had not volunteered.  (*Id.*)  Mincy was concerned that the auditing task might require her to work on her days off and that she would be unable to complete the audits if she had to take medical leaves of absence.  (*Id.* at 98-99; Broerman Dep. 127-28.)

On January 18, 2008, Mincy was issued a "First Written Warning" for failure to "follow[ ] a clear directive to begin the assigned task of Open Record Reviews."  (Mincy Dep.

124-25 & Ex. 8.)  Mincy was instructed in the First Written Warning to "complete the training and begin [the auditing] by February 1st" and told that "further refusals" to comply would "subject [her] to progression through the disciplinary process, up to and including termination." (*Id.*)  Mincy began auditing in approximately March 2008 after she had spoken to Theresa Broerman, the Director of Residential Services and Psychiatry, about the assignment.  (*Id.* at 122-23, 127-32.)  Broerman told Mincy that other employees would be required to help her audit the medical charts.  (*Id.*)

Additionally, around that same time, Mincy received what she termed "FYIs" from Broerman that her attendance needed to improve.  (*Id.* at 129-32 & Ex. 9.)  She understood Broerman's concern about her attendance to arise from her taking FMLA-approved absences. (*Id.*)  Broerman knew that Mincy had been treated for mental health issues and that she took medication for treatment.  (Broerman Dep. 120-22.)  Mincy testified that, around the time of the auditing issue, Broerman referred to her as a "psych patient" and stated that it was "hilarious" that she was working on a "psych unit" for children.  (Mincy Dep. 133-34.)  Broerman told her and confirmed in an email that she should consider requesting disability or social security payments, and stop working, if she could not improve her attendance and on-time record.  (*Id.* at 133-37 & Ex. 9.)

Broerman characterized their discussion differently.  She testified that she discussed with Mincy the fact that Mincy was feeling stressed and that treating patients with mental health was a stressful position.  (Broerman Dep. 124.)  She testified that they discussed whether Mincy's job was the "best place" for her.  (*Id.*)  Broerman also testified that, based on Mincy's own concern about her mental health and her ability to perform her job duties, she had concerns whether

Mincy's mental health condition adversely affected her ability to perform her job.  (*Id.* at 124-25.)  She further testified she discussed with Mincy that all hospital employees are required occasionally to take on new responsibilities, such as the auditing task.  (*Id.* at 128.)

### 3. Culture Change Meeting and Use of Racial Slurs on the Residential Unit

During Spring 2008, Children's Hospital provided training for staff, referred to as "Culture Change" training, which focused on de-escalation techniques and reinforcement of positive behaviors for psychiatric patients.  (Canos Dec. ¶ 4; Mincy Dec. ¶ 16.)  The parties disagree, however, as to the length of the training.  Rodolfo Canos, the Clinical Manager for the residential units at the College Hill campus of CHMC, stated that the training lasted several days. (Canos Dec. ¶ 4.)  Mincy stated that the training lasted for only three hours.  (Mincy Dec. ¶ 16.)  Broerman was present at the training.  (*Id.*)

Mincy testified that prior to the culture change meeting there had been multiple incidents where the "N-word" and other racial slurs were used on the P2 South unit by patients and staff.  (Mincy Dep. 160-69.)  She stated that she complained about this use of racial slurs to supervisors and management, including to Smith, Broerman, and Canos.  (*Id.* at 161, 163-64.)  For example, Mincy was offended when a co-worker told her that she [the co-worker] had found it funny when she overheard a black patient call a blond-haired, blue-eyed patient a "nigger."  (*Id.* at 162-64.)  She reported the incident to their supervisor.  (*Id.*)  In another example, a African-American nurse who was wearing overalls was told by a different nurse that she looked like she had "just come in from the fields picking cotton."  (*Id.* at 166-67.)  Mincy also reported this incident to her supervisor.  (*Id.*)  The supervisor told Mincy that he would speak to the nurse to whom the comment was directed, but Mincy does not know what happened next, if anything, in regard to

the incident.  (*Id.*)  Additionally, Mincy testified that patients were listening to hard core rap music in which racial slurs were repeatedly used.  (*Id.* at 168-69.)  Finally, Mincy testified that a nurse raised a concern about a patient's use of the N-word at the culture change meeting.  (*Id.* at 160-61.)

### 4.     First Charting/Patient Status Error

On August 27, 2008, Canos sent Mincy an email stating that Mincy had charted on a patient who already had been discharged from the residential unit.  (Mincy Dep. 223-25 & Ex. 14.)  The alleged charting error had occurred about one week prior on or about August 22, 2008.  Canos did not state in the email that any investigation or discipline would follow as a result of the alleged error.  Mincy responded in an email dated September 4, 2008 by suggesting that any charting discrepancy in August had been caused by workers on earlier shifts who failed to keep the census board up to date.  (*Id.* Ex. 14.)  The census board contained the patients' names, room numbers, social worker, doctor's name, and their care level.  (*Id.* at 226-27.)  Mincy stated in her response:

> Please inform your leads [*i.e.*, staff leaders] to keep up with the board and their paperwork and these problems wouldn't happen.  I don't have the luxury of placing names with faces on the third shift.  I count bodies and put it together with the paperwork in the box.

(*Id.* Ex. 14.)  Finally, Canos replied, in part:

> I can ask the Leads and Co-Leads to make sure the board is updated.  How was a body counted on 8/22/08 and 8/25/08 when she was discharged on 8/21/08. [*sic*] I hear you complaining about other staff's deficiencies, but where is accountability on your end?  All clients are to be checked on physically during the shift.  That means opening doors and going into rooms.  Looking at names on the board and assuming they are there is unacceptable.

(*Id.*)

On September 18, 2008, Canos and Broerman delivered verbal counseling to Mincy regarding the August 22, 2008 charting incident. Broerman also prepared a written "Verbal Counseling Memo" dated September 15, 2008 documenting the incident and the counseling which Mincy received. (*Id.* Ex. 15.) Mincy was criticized for failing to "check the client's room to confirm her presence." (*Id.*) Mincy was counseled to "attend and actively participate in report with the prior shift, and make sure you know the status of each client [*i.e.*, patient] to whom you are assigned." (*Id.*) Nicole Murray, Mincy's co-worker, also had charted on the patient after her release and she received the same verbal counseling and a similar memo. (Canos Dec. ¶ 12.)[1]

5.      **Mincy Disciplined For the Manner in Which She Complained About Racial Graffiti**

On September 3, 2008, two patients wrote racial graffiti—"niggas for life" and "ace boon coons"—on the dry erase boards hanging on their doors. (Canos Dec. ¶ 9.) Management directed that the graffiti be erased, but Mincy did not believe that erasure was a sufficient remedy. (Mincy Dep. 276.) Mincy sent out an email complaining about the graffiti to over 100 individuals at the College Hill facility on September 4, 2008. (*Id.* at 254 & Ex. 16.) Canos responded to Mincy's widely-disseminated email by suggesting that she utilize the chain of command when expressing her concerns. (*Id.* at 260 & Ex. 17.)

Dr. Michael Sorter, the Director of the Division of Child and Adolescent Psychiatry, also sent out an email to CHMC employees stating in part:

_____

[1] Mincy denied the fact above, but supported the denial only with inadmissable hearsay evidence. (Mincy Dec. ¶ 16.) The Court deems the fact above admitted for purposes of the summary judgment motion.

"[W]e do not tolerate any type of racial discrimination or intimidation. . . I want to remind all staff that if there are incidents or occurrences that have racial overtones or any type of discriminatory speech or actions, we strongly encourage you to bring these to our attention. We encourage you to communicate directly with your immediate supervisor or leadership in the Division of Psychiatry about any such incidents. Please refrain from use of the [email system] announcements.

*Id.* at 271 & Ex. 19.) Mincy responded to Dr. Sorter in an email to him. She stated in part as follows:

. . . I would like for you to understand a few things. We have discussed the racial strife, division and slurs that consistently occur on the unit as well as the lack of leadership, teaching and the high tolerance for negative behaviors many times without any results, changes, followup or follow-through. The chain of command was, met, [*sic*] it was called "culture change[.]" These groups were set up to discuss unit and staff issues. The social worker as well as the manager's [*sic*] were there. Everyone voiced these concerns about the lack of leadership on that unit and there [*sic*] feeling unsafe on the unit because of the lack of leadership.

(*Id.* at 272-73 & Ex. 20.)

Broerman sent a follow-up email dated September 9, 2008. She stated in her email that she would request "the practice council and the cultural competence groups" to look further at the issue of racial comments. (*Id.* at 279 & Ex. 21.) She also stated that "no racial slurs should be allowed in the unit at this time." (*Id.*) Mincy objected to a human resources representative, Ron McKinley, that Broerman's email, and specifically her use of the phrase "at this time," suggested that Broerman would tolerate the use of racial slurs when "eyes are not upon" the unit. (*Id.* at 279-80 & Ex. 22.) She also told McKinley that there was a long history of racial incidents on the unit, that rules and policies were being ignored, and that the unit was unsafe for the staff and the patients. (*Id.* at 280-81.)

On September 18, 2008, Broerman completed a written "Employee Warning Notice" placing Mincy on "First Written Warning" for violating CHMC's "CARES Standards" by

allegedly yelling at her co-workers about the racial graffiti and by sending the widely-disseminated email about the graffiti.  (*Id.* at 288-90 & Ex. 23.)  Mincy denies that she yelled at her co-workers.  (Mincy Dec. ¶ 7.)

      **6.**     **Second Charting/Patient Status Error**

Mincy allegedly made a second alleged charting error later on September 18, 2008 during the third shift, several hours after she had been disciplined for her first alleged charting error. Mincy wrote on a "Progress Sheet" as follows on the night of September 18, 2008:  "Client asleep throughout shift without difficulty.  Up for code red."  (Canos Dec. ¶ 6 & Ex. 1.) However, the "blurbs" for that evening indicated that the patient was in the inpatient unit, not in the residential unit.  (*Id.* ¶ 6 & Ex. 2.)  Mincy stated in her Declaration that "blurbs" were typically prepared by the lead MHS on the shift and that they were "regularly found to be inaccurate or incomplete."  (Mincy Dec. ¶ 13.)

Mincy testified that Michelle Minnette, the lead staffer on the second shift, told her and her co-worker at the shift change that the patient information on the census board was accurate. (Mincy Dep. 299-300, 304-05.)  Mincy testified that Minnette did not tell them that a patient from their residential unit had been transferred to an inpatient unit.  (*Id.* at 299-300.)  The name of the transferred patient remained on the patient census board.  (Dawson Behnass Dep. 9-10.) Yvonne Dawson Behnass, Mincy's co-worker and another MHS, then completed the initial paperwork for their shift while Mincy completed room checks.  (Mincy Dep. at 306-07.) Dawson Behnass prepared a progress note with a blank label for the patient who had been transferred because the patient's name was on the census board.  (Dawson Behnass Dep. 22.)

A fire drill, or code red, was held on the unit that night and Dawson Behnass took all of

the patients on the unit, except for one, down to the basement. (Mincy Dep. at 311-13.) Mincy stayed behind to care for one patient who was heavily medicated and had difficulty waking up. (*Id.*) Dawson Behnass took the patients back to their rooms when the drill was finished. (*Id.* at 313-14.) Dawson Behnass and Mincy then continued to check the rooms throughout their shift. (*Id.* at 314.) Mincy stated that the error she charted—marking the patient who was not on the unit as being asleep on the unit except for during the code red—resulted from her reliance on the sheets that Dawson Behnass had given her after the start of the third shift. (*Id.* at 306-07, 309-10, 321-25.)

Mincy testified at her deposition that she had not done anything wrong during the third shift on September 18, 2008. Mincy checked her paperwork or patient sheets with the census board with the name on the patients' door. (Mincy Dep. at 314, 329-30.) She believed that the number of patient sheets she had matched the number of patients which she checked on. (*Id.* at 315-16.) She looked in the room where the patient in question was supposed to be and saw what appeared to be a body. (*Id.* at 327.) She did not pull the bed sheets back to confirm the presence of the patient. (*Id.* at 330.) She stated that when she checked on patients she regularly saw what looked like a lump under the sheets because the patients were covered in so many blankets. (*Id.* at 327-28.) Mincy testified that she when she checked on her patients in the middle of the night that she could not wake them up or pull off their bed sheets for fear they would react in a "horrific way." (*Id.*) She stated that she was instructed "from the very beginning" not to wake up a patient or shine a flashlight on them. (*Id.* at 232-33.) Rather, she was instructed to merely to open the door and step inside the room to check for a patient. (*Id.* at 233-34.)

Joseph Dennemann, another MHS, confirmed in part Mincy's understanding about the

correct procedure to confirm that patients were in their beds. He stated that shining a flashlight into the face of a sleeping patient could cause traumatic reactions for the residential patients. (Dennemann Dep. 53-54.) On the other hand, he testified that if he had any doubts whether a visible lump on a bed was a patient or merely a pile of clothes or blankets, he would flip the lights on quickly to verify whether it was a person. (Dennemann Dep. 39-40.) Dennemann stated that he had made errors by charting on patients who were not present on the unit even following the procedure he described. (Dennemann Dep. 54.) Additionally, Dawson Behnass, also testified that she had assumed during room checks that a lump on a bed in a patient's room was the patient. (Dawson Behnass Dep. 64-66.) "I have did [sic] my room checks and pretty much looked at a body bundle or a clothing bundle and assumed that hopefully that's the body that I'm counting." (*Id.* at 64-65.) She further testified that she was told to never pull the covers off of a patient. (*Id.* at 65.)

Mincy's error was discovered by the first-shift staff the next day. (*Id.* at 320.) Mincy later spoke to another staff member working at the hospital and asked her to pull or shred the mistaken patient paperwork because she did not want the error to be repeated. (*Id.* at 321.) Management suspended Mincy pending an investigation. Dawson Behnass and Minnette were not disciplined for their conduct on the night of September 18. (Dawson Behnass Dep. 35; Canos Dep. 91-92.)

### 7. Town Hall Meeting

In late September, CHMC management held a town hall-type meeting with staff to address staff members' concerns and the correct procedures for reporting concerns. (Sorter Dep. 33-35.) Dr. Sorter, Broerman, and Marilyn Martin from human resources, along with many staff

members, attended the town hall meeting. (Broerman Dep. 144.) Dennemann, the MHS, stated at the town hall meeting that the patient information system used on the residential unit was poorly designed and likely to lead to charting errors. (Dennemann Dep. 25-26.) Dennemann believed that a majority of staff had made charting errors. (*Id.* at 26.) Dennemann also stated that the generally accepted procedure to correct a charting error made on the third shift was to shred the erroneous document and re-do the charting. (*Id.* at 27-28.)

Staff members' concerns about the use of racial slurs on the unit was also discussed at the town hall meeting. (Broerman Dep. 145.) Susan Phoenix discussed at the meeting a prior incident during which, after a patient had used the word "nigger" to a Caucasian nurse, the nurse laughed and commented to Phoenix that "you have to be brown or darker to be a nigger." (Phoenix Dep. 38-46.) Phoenix stated that she had reported this incident to Broerman, but Broerman denied any knowledge about the incident at the meeting. (*Id.*) Phoenix also testified that Dr. Sorter stated that he had seen racial graffiti on a patient's door, had considered erasing it, but left it on the door after observing that all the patients and workers on the unit were African-American. (Phoenix Dep. 46-48.)

No further incidents of racial graffiti were reported after the town hall meeting. (Canos Dec. ¶ 10.)

### 8. Mincy's Termination

On September 30, 2008, Broerman and Martin met with Mincy to inform her that her employment was being terminated for negligently performing her duties. At the close of the meeting, Broerman was prepared to escort Mincy from the building. Access to the building, elevators, and units was restricted. Mincy could not have departed from the building without an

escort because she no longer had her badge or keys.  Mincy objected to being escorted by Broerman because she did not trust Broerman and she did not think it would be a good idea to be alone with Broerman.  (Mincy Dep. 348-50.)

Mincy protested her termination using CHMC's Conflict Resolution Process.  Mincy met with HR representative Erinn Gordon and provided the reasons for her protest.  Gordon upheld Mincy's termination at the first level of review.  Mincy then requested a higher level review of the decision.  She was scheduled to meet with a Senior Area Administrator, but she did not show up for the meeting or further pursue her appeal.

CHMC did not replace Mincy, but rather dispersed her night shift hours among approximately twenty existing staff members.  (Canos Dec. ¶ 8.)

### 9.      Post-Termination Events

After Mincy's termination, Dennemann had several meetings with Canos.  (Dennemann Dep. 32-36.)  During one discussion, Dennemann told Canos that staff members had anxiety about the issue of charting and the proper method to chart.  (*Id.* at 32-33.)  He testified, "[P]eople were fearful of losing their jobs given that one of our co-workers [Mincy] had just recently been terminated for charting errors."  (*Id.* at 33.)  Dennemann testified that Canos responded by stating, "that was not something that I or my co-workers needed to worry about, that that was not the reason this employee [Mincy] had been terminated and, basically, that we did not have anything to worry about."  (*Id.* at 36.)

Also, Yvonne Dawson Behnass testified that in October 2008 she charted on a patient who was not on the unit.  She received a verbal warning for this conduct from Canos, but was not otherwise disciplined.  (Dawson Behnass Dep. 33-34.)

## B.     Procedural History

Mincy initiated this suit against Children's Hospital on January 29, 2009.  On September

8, 2009, she filed an Amended Complaint asserting the following causes of action against

Children's Hospital:

(1)     Retaliation pursuant to 42 U.S.C. § 1981;
(2)     Retaliation pursuant to Ohio Revised Code ("O.R.C.") Chapter 4112;
(3)     Race discrimination (hostile work environment) in violation of 42 U.S.C. § 1981;
(4)     Race discrimination (hostile work environment) in violation of O.R.C. Chapter 4112;
(5)     Violation of the Family and Medical Leave Act ("FMLA");
(6)     Disability discrimination in violation of O.R.C. Chapter 4112;
(7)     Wrongful discharge in violation of Ohio public policy/Unsafe workplace;
(8)     Retaliation in violation of Title VII;
(9)     Race discrimination (hostile work environment) in violation of Title VII;
(10)    Disability discrimination in violation of the ADA;
(11)    Wrongful discharge in violation of Ohio public policy/Unsafe treatment environment;
(12)    Wrongful discharge in violation of Ohio public policy/Discriminatory treatment environment; and
(13)    Defamation.

(Doc. 12.)

## II.     STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 governs motions for summary judgment.  Summary

judgment is appropriate if "there is no genuine issue as to any material fact" and "the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  On a motion for summary

judgment, the movant has the burden of showing that no genuine issues of material fact are in

dispute, and the evidence, together with all inferences that can permissibly be drawn therefrom,

must be read in the light most favorable to the party opposing the motion.  *Matsushita Elec.*

*Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).

The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). The nonmoving party must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The Court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

## III. ANALYSIS

### A. Retaliation

Mincy alleges that she was retaliated against in violation of Title VII, O.R.C. chapter 4112, and 42 U.S.C. § 1981 because she opposed what she believed to be an unlawful racially hostile and discriminatory work environment. Title VII and the Ohio Revised Code prohibit retaliating against an employee because she has opposed an illegal discrimination practice or has filed a discrimination charge. *See* 42 U.S.C. § 2000e-3(a); O.R.C. § 4112.02(I).

Children's Hospital assumes for purposes of summary judgment that Mincy can establish a prima facie of retaliation. However, it asserts that it terminated Mincy, not because she opposed any unlawful practice, but rather because she negligently performed her job duties. The issue, therefore, is whether Mincy has sufficient evidence that CHMC's stated reason was

pretext for concealing unlawful retaliation.  The Court finds that she does.

Primarily, the testimony of Joseph Dennemann strongly suggests pretext.  Dennemann testified that Rodolfo Canos, the Clinical Manager for the residential units of the College Hill campus of CHMC, told him that Mincy was not terminated because she made charting errors, but rather was terminated for other issues.[2]  Also, Mincy was not the only worker who was allegedly negligent the night of September 18, 2008, but she is the only worker who was disciplined.  Mincy testified that, at the shift change, Michelle Minnette confirmed the veracity of the patient census board information and failed to state that any patient had been transferred to an inpatient unit.  Yvonne Dawson Behnass prepared a blank progress note for the transferred patient at issue and presented it to Mincy.  Mincy had relied, in part, on the erroneous information from both Minnette and Dawson Behnass when she completed her charts, but only she was disciplined.  Finally, Dennemann and Dawson Behnass testified that on different occasions they had charted on patients who were not on the unit, but they were not disciplined.  Though Defendant might dispute the seriousness of other staffers' negligence, a reasonable jury might conclude that CHMC did not ordinarily view charting errors as sufficient reason for an employee's

_____

[2]  Children's Hospital tries to draw a bright-line distinction between clerical charting errors, and the negligent performance of duties which could lead to erroneous information being entered onto a patient chart.  Children's Hospital contends that it terminated Mincy because she negligently performed room checks, not because of a clerical error.  However, a reasonable jury could find that the two types of errors are interrelated.  It was Mincy's alleged negligence in checking on the patient's status that led to her alleged charting error.  A reasonable jury hearing Dennemann's testimony in context could infer that the type of charting error to which Dennemann and Canos referred was not a simple clerical error, but rather referred to a substantive mistake about a patient's status made in reliance upon a negligently-performed room check.

termination.[3]  In sum, the Court finds that Mincy has put forth sufficient evidence that she was terminated in retaliation for her complaints about workplace racial issues to survive summary judgment.  The Court will **DENY** summary judgment to Children's Hospital on the retaliation claims.

## B.    Race Discrimination/Hostile Work Environment

Mincy also asserts hostile work environment claims in violation of Title VII, O.R.C. chapter 4112, and 42 U.S.C. § 1981.

"Hostile-work-environment claims 'involve[ ] repeated conduct' and require the plaintiff to demonstrate that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe and pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Perkins v. Harvey*, No. 09-5443, slip copy, 2010 WL 785917, at *4 (6th Cir. Mar. 9, 2010) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115-16 (2002)).  Courts examine multiple factors to determine whether an actionable work environment claim exists including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Morgan*, 536 U.S. at 116 (citation omitted).  A plaintiff establishes a hostile work environment claim with evidence that (1) she is a member of a protected class, (2) she was subjected to harassment, either through words or actions, based on the protected characteristic, (3) the harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an objectively

---

[3] By supplying these examples of evidence of pretext, the Court does not intend to foreclose Mincy from arguing at trial that other evidence also is suggestive of pretext.

intimidating, hostile, or offensive work environment, and (4) there exists some basis for liability on the part of the employer. *Perkins*, slip op., 2010 WL 785917, at *4. An employer can be held liable if it knew or should have known about the abusive conduct and did not nothing to correct the situation. *Smith v. Leggett*, 220 F.3d 752, 760 (6th Cir. 2000).

In this case, Mincy's evidence consists of isolated, though numerous, incidents in which patients and other staff members directed racial slurs at each other or used racially-offensive language. Importantly, patients or staff members did not direct racial slurs at Mincy or physically threaten her in a racially-charged manner. Although there is evidence that Dr. Sorter permitted racial graffiti to remain on a patient's door in one instance, it is undisputed that management took remedial steps in response to other racial incidents. Management directed the racial graffiti posted on or about September 3, 2008 be erased. Dr. Sorter sent out a reminder email following the September 3 incident stating that racial slurs were not allowed. Management also permitted staff members to voice their concerns about the use of racial slurs at the town hall meeting. The evidence submitted by Mincy fails to establish that Children's Hospital condoned a workplace which was so permeated by racial animus that it created objectively intolerable working conditions or unreasonably interfered with Mincy's work performance. The Court will **GRANT** summary judgment to Children's Hospital on Mincy's racial discrimination/hostile work environment claim.

C.      **FMLA Claim**

Mincy asserts an FMLA retaliation or discrimination claim. The FMLA entitles an eligible employee to twelve weeks of leave during any twelve-month period because of, inter alia, "a serious health condition that makes the employee unable to perform the functions of the

position of such employee."  29 U.S.C. § 2612(a)(1)(D).  The FMLA retaliation provision

provides that "[i]t shall be unlawful for any employer to discharge or in any other manner

discriminate against any individual for opposing any practice made unlawful by this subchapter."

29 U.S.C. § 2615(a)(2).  There is no dispute that Mincy took intermittent FMLA leaves of

absence during her employment at Children's.  Mincy asserts in this claim that she was

terminated for taking the leaves of absence.

Courts in the Sixth Circuit "appl[y] the familiar burden-shifting test articulated in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to

retaliation claims under the FMLA."  *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir.

2006).  To prove a prima facie case of FMLA retaliation, a plaintiff must establish that there was

a causal connection between her taking FMLA leave and her termination.  *Id.*  Mincy does not

dispute that she was afforded all of the FMLA leave to which she was entitled.  Children's

Hospital moves for summary judgment on the grounds that it terminated Mincy for negligently

performing her job duties, not because she took FMLA leave.

Mincy has proffered evidence that her termination might have been related to her use of

FMLA leave.  Broerman informed Mincy in March 2008, approximately six months before she

was terminated, that she needed to approve her attendance.  Further, Broerman stated that

Mincy's attendance was "right on the cusp" of being an issue in September 2008 when she was

terminated.  (Broerman Dep. 122.)  This evidence is sufficient to raise a disputed issue of fact as

to the causation element.  Turning to the legitimate non-discriminatory reason and the pretext

prongs, the analysis here mirrors the analysis of these issues in regards to the retaliation claims.

Accordingly, the Court will **DENY** summary judgment to Children's Hospital on the FMLA

claim.

**D.      Disability Discrimination Claims**

Mincy alleges in this claim that she was terminated because she was regarded as being disabled.  The ADA prohibits a covered employer from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Similar to the ADA's general prohibition, Ohio law makes it unlawful for an employer, "because of the . . . disability . . . of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."  O.R.C. § 4112.02(A).  Courts are permitted to look to regulations and cases interpreting the ADA when applying the Ohio law.  *See Knapp v. City of Columbus*, 192 F. App'x 323, 328 (6th Cir. 2006); *Columbus Civil Serv. Comm'n v. McGlone*, 82 Ohio St. 3d 569, 573, 697 N.E.2d 204 (1998).

Under the ADA as it existed in September 2008, when Children's Hospital terminated Mincy,[4] a disability was defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(1).  Similarly, a disability under Ohio law is "a physical or mental impairment that substantially limits one or more major

---

[4] The ADA was amended by the ADA Amendments Act of 2008, Pub.L. No. 110-325, 122 Stat. 3553 (2008) ("ADAAA").  The ADAAA became effective on January 1, 2009 and it does not apply retroactively.  *See, e.g., Verhoff v. Time Warner Cable, Inc.*, 299 F. App'x 488, 494 (6th Cir. 2008); *Vaughn v. Rent-A-Center, Inc.*, No. 2:06-cv-1027, 2009 WL 723166, at *3 n.1 (S.D. Ohio Mar. 16, 2009).

life activities . . .; a record of a physical or mental impairment; or being regarded as having a physical or mental impairment."  O.R.C. § 4112.01(A)(13).  Mincy contends that Defendant regarded her as having a disability.  The Supreme Court has explained that an individual can be "regarded as" having a disability in two circumstances:

> (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities.  In both cases, it is necessary that a covered entity entertain misperceptions about the individual – it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting.

*Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999).

Mincy asserts that CHMC regarded her as being substantially limited in the major life activity of working by her depression.  "When the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs."  *Id.* at 491.  Stated differently, "[t]o be substantially limited in the major life activity of working . . . one must be precluded from more than one type of job, a specialized job, or a particular job of choice."  *Id.* at 492.  This is a difficult standard for a plaintiff to meet, particularly at the summary judgment stage, because "it is safe to assume employers do not regularly consider the panoply of other jobs their employees could perform."  *Ross v. Campbell Soup Co.*, 237 F.3d 701, 709 (6th Cir. 2001).  In this instance, however, Broerman testified that she had concerns whether Mincy's mental health condition adversely affected her ability to perform her job.  Broerman discussed with Mincy whether she needed to consider receiving social security or disability payments, in lieu of working, because of her poor attendance or because she felt stressed at work.  Finally, Broerman had told Mincy

that all hospital employees had to be able to take on new responsibilities, something which had concerned Mincy in regards to auditing the medical charts. This evidence is sufficient at the summary judgment stage to establish at least a disputed issue of fact of whether Broerman regarded Mincy as disabled.

As to whether Children's Hospital discriminated against Mincy because it regarded her as disabled, the evidence and analysis tracks that of the retaliation and FMLA claims. Accordingly, the Court will **DENY** summary judgment to Children's Hospital on the FMLA claim.

**E.     Wrongful Discharge in Violation of Ohio Public Policy**

Mincy asserts three separate public policy claims. In the first two, she asserts that she was terminated because she complained about an "unsafe workplace" and an "unsafe treatment environment." (Doc. 12 at 8, 9.) In the third, she asserts that she was terminated because she complained about a "discriminatory treatment environment." (*Id.* at 9.)

The elements of a discharge in violation of public policy claim in Ohio are as follows:

1. A clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element);

2. Dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element);

3. The plaintiff's dismissal was motivated by conduct related to the public policy (the causation element); and

4. The employer lacked overriding legitimate business justification for the dismissal (the overriding justification element).

*Collins v. Rizkana*,  73 Ohio St.3d 65, 69-70, 652 N.E.2d 653 (1995) (quotation and citation omitted).

Beginning with the third public policy claim, the discriminatory treatment environment

claim, the Ohio Revised Code prohibits the employees and managers "of a place of public accommodation" from denying a person the enjoyment of the public accommodation on the basis of person's race. O.R.C. § 4112.02(G). A hospital is a place of public accommodation under Ohio law. *See Fiske v. Rooney*, 105 Ohio App. 3d 269, 275, 663 N.E.2d 1014, 1018 (1995) (citing Ohio Admin. Code § 4112-5-02(I)). The Ohio Revised Code also prohibits an employer from retaliating against an employee because he has opposed an illegal discrimination practice or has filed a discrimination charge. *See* O.R.C. § 4112.02(I). Accordingly, Mincy has a remedy under Ohio statutory law if CHMC terminated her because she opposed a discriminatory treatment environment at the hospital and she cannot satisfy the jeopardy element necessary to assert a public policy claim. *See Leininger v. Pioneer Nat'l Latex*, 115 Ohio St. 3d 311, 319, 875 N.E.2d 36 (2007). The Court will **GRANT** summary judgment to Children's Hospital on her discriminatory treatment public policy claim.[5]

Turning to the first two public policy claims, Children's Hospital does not dispute for purposes of summary judgment that Ohio public policy protects an employee who complains about an unsafe workplace or unsafe treatment environment. Instead, it contends that she cannot prove either the causation or lack of business justification elements. Children's Hospital asserts that Mincy was terminated for negligently performing her job duties, not because she complained about the safety or her workplace or treatment environment. Mincy, on the other hand, contends that she was terminated because she objected to incidents of racial harassment and the treatment of African-American patients on the residential unit. The analysis of the

---

[5] Mincy suggests in her brief that the Court should permit her to assert this claim pursuant to O.R.C. § 4112.99 in lieu of granting summary judgment. However, Mincy has not moved to amend her pleadings. The Court will grant summary judgment on this claim.

parties' competing views of the evidence on the remaining public policy claims again tracks the analysis of the pretext issue for the retaliation claims. Issues of material fact remain in dispute and, based on Defendant's arguments, the Court will **DENY** summary judgment at this time on the unsafe workplace and unsafe treatment environment public policy claims.

**F.      Defamation**

Mincy does not respond to Defendant's summary judgment motion as to this claim. Specifically, she offers no rebuttal to Defendant's arguments that it would be entitled to qualified immunity as any alleged defamatory statements. The Court finds that Mincy has abandoned her defamation claim and/or that Children's Hospital is entitled to summary judgment. The Court will **GRANT** summary judgment to Children's Hospital on the defamation claim.

**IV.     CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment (doc. 22) is **GRANTED IN PART** and **DENIED IN PART**. Defendant is accorded summary judgment on Mincy's race discrimination/hostile work environment claim, discriminatory treatment public policy claim, and defamation claim. Summary judgment is denied as to all other claims.

IT IS SO ORDERED.


    ___s/Susan J. Dlott_____
    Chief Judge Susan J. Dlott
    United States District Court